A. M. WILHELM v. ISAAC BURLEYSON and wife.

*Deed — Evidence — Probate — Prayer for Instructions — Objection in Apt Time — Riparian Ownership.*

1. In an action involving the title to land, objection to the introduction of a deed as evidence will not be sustained unless the probate is defective.
2. Question in regard to it may be raised after its introduction by prayers for instruction.

3. The defendant objected to the introduction of a deed by plaintiff without stating his grounds. The plaintiff introduced other evidence tending still further to validate the deed. Defendant did not ask any instruction as to the effect and character of the deed: *Held*, he cannot for the first time in this Court raise objection that the deed was only evidence of color of title, or that it could not be considered at all.

4. In 1845 a creek ran through the lands of one A., but was not a boundary. In 1858 the creek was made a dividing line, in part, between two of his heirs. The question in an issue of title between those claiming under them was, whether the creek changed its bed after the division: *Held*, that evidence of where the creek ran in 1845 was not evidence of where it ran in 1858. Only the changes which occurred since the division in 1858 were material.

5. Admission of such evidence was calculated to mislead the jury, and there should be a new trial upon the issues involved.

6. Where there was an issue of damages for erecting a dam upon the bank of a creek, so that the water "eddied" and overflowed plaintiff's land on the other side, it appeared that the plaintiff had also previously erected a dam which caused the defendant to have to erect one for the protection of his land, the Court charged the jury: "While it is true a riparian owner may erect bulwarks to protect his property from injury by the stream, he can only do so when, by the exercise of reasonable care, it can be done without injury to others": *Held* to be error.

7. The defendant stands in a better condition in this respect than if he had taken the *initiative* and built his dam first, and if his dam was necessary to protect him, and caused plaintiff injury, he is not liable.

This was a CIVIL ACTION, tried at February Special Term, 1887, of the Superior Court of CABARRUS County, before *Boykin, J.*

The plaintiff declared upon these causes of action as follows:

1. That he is the owner of the following described tract of land, situate in this county, viz: Beginning at two white-oaks on White's line, near the creek; runs thence with the line south 7 east 68½ poles to a stake; then north 74 east 68

poles to a red-oak (W. Bost's heirs' corner); then north 7 east with a lane 34 poles to a stone; then south 65 east 54 poles to an ironwood on the bank of the creek (Bost's heirs' corner); then north 62 east 20 poles with the creek to a stake in the creek; then south 72 east 15 poles to a stake (Allen Bost's corner); then north 21 west 36 poles to a persimmon (Allen Bost's other corner, in an old field); then north $52\frac{1}{2}$ west $32\frac{1}{2}$ poles to a stone in the road (A. Bost's corner); then north $81\frac{1}{2}$ west $10\frac{1}{2}$ poles to the center of a spring (Bost's corner); then north 45 east 4 poles to a locust grub (A. Bost's corner); then north 46 west 20 poles to a stake on the bank of a gully; then south 63 west $45\frac{1}{2}$ poles to a sycamore on the bank of the creek; thence with the meanderings of the creek 68 poles to the beginning.

2. That, on or about ____ day of _____, 1881, the defendant wrongfully entered upon said tract of land, and upon the north bank of the creek erected a dam, or placed obstructions, so that the water in said creek was diverted, in times of freshet or high water, from the channel of the creek, and, in consequence of said dam, or obstructions overflowed and greatly damaged plaintiff's lands on the south side of said creek, to wit, to the amount of five hundred dollars.

For a second cause of action, plaintiff alleges—

1. That he is the owner of the tract of land described in paragraph one of his first cause of action.

2. That, on or about ____ day of _____; 1881, the defendant wrongfully entered upon the said tract, cut down the timber, trod down the grass, and other wrongs did to the said tract of land, greatly to plaintiff's injury, to-wit, to the amount of one hundred dollars.

For a third cause of action, plaintiff alleges—

1. That he is the owner of the tract of land described in paragraph one of his first cause of action.

2. That, on or about the ____ day of _____, 1881, the defendant erected on the north bank of the creek known as "North Anderson's Creek," a wall and other obstructions, so that in times of freshet or high water, in consequence of said wall and obstructions, the water of said creek was caused to overflow and flood the lands of plaintiff lying on the south side of said creek, to his great damage, to wit, five hundred dollars

Wherefore, plaintiff demands judgment for five hundred dollars, his first cause of action; for one hundred dollars, his second cause of action, and for five hundred dollars, his third cause of action, and for costs.

The following are the issues submitted to the jury and the answers thereto:

1. Did the defendant, in 1881, enter unlawfully on the plaintiff's lands described in the complaint, and cut and destroy timber thereon, as alleged in the complaint? Ans. Yes.

2. What damages, if any, has the plaintiff sustained thereby? Ans. Twenty-five dollars.

3. Did the defendant, in 1881, unlawfully build a wall and other obstructions on the north side of Anderson's Creek, as alleged in the third cause of action, whereby the water of Anderson's Creek was caused to overflow the plaintiff's land, as alleged in the third cause of action? Ans. Yes.

4. What damage, if any, has the plaintiff sustained thereby? Ans. Forty dollars

The plaintiff offered several deeds as evidence of title, which are not necessary to mention. Among the number was one from R. W. Allison, Clerk and Master, to Allen Boyer. The defendant objected to the introduction without stating the grounds of objection, and the plaintiff offered certain records of the Court of Equity tending to show that the deed was executed under a decree of said Court. It does not appear that the defendant subsequently asked any instruction, or in any way elicited the opinion of the Court

as to the effect of the record, or whether the deed from Allison was considered as color of title or as a link in the plaintiff's chain of title.

One Stowe was introduced as a witness, and testified, in substance, that he was present at the survey of the Andrew Carriker land; that the channel of the creek at that time was the red line on the diagram. He also testified as to the ownership of the land before the same was owned by Andrew Carriker and David N. McEachern.

He was cross-examined by the defence as to the location of the old channel, and the extent of time of his knowledge thereof.

To contradict said witness, defendant's counsel procured from the office of the Register of Deeds a certain deed from Seneca Turner to John W. Morgan, and was proceeding to read the contents of the same, when the plaintiff's counsel demanded information as to the nature of said instrument, which was given.

There was objection by plaintiff, and thereupon the defendant introduced the said deed in evidence. This deed conveys land described in the complaint, and is made a part of this case, and bears date the 1st day of February, 1836.

Thereafter, said witness Stowe was permitted to testify as to the location of the channel in 1845, prior to the possession of the common ancestor. Certain witnesses for the plaintiff had testified that the channel of the creek had changed. Witness for the defence had testified that the channel remained as it was thirty or forty years ago.

The defendant objected to this evidence of the witness Stowe. Objection overruled, and defendant excepts.

The other material facts are stated in the opinion of the Court.

From the judgment in favor of plaintiff, the defendant appealed.

106—25

*Mr. W. G. Means* (by brief), for plaintiff.
*Mr. P. B. Means*, for defendant..

AVERY, J.—after stating the facts: An objection to the introduction of a deed, offered as evidence, will not be sustained as a rule, unless the probate is defective and the reading of it is resisted on that ground. *Vickers* v. *Leigh*, 104 N. C., 248.

After its admission the parties can raise any question that may be pertinent, by prayers for instruction to the jury in reference to its character or weight as evidence of title. It is true that the plaintiff seems to have offered certain records, so soon as the objection was made. But the defendant did not request the Court so far as the record informs us to tell the jury that the deed should be considered only as color of title, or that it was not to be considered at all. We find no copy of the deed in the record, nor does it appear what instruction was asked or given to the jury upon the subject of title.

There was no exception that put the Judge below on notice to send up the deed, or so much of the charge as related to title, and it would be manifestly unjust, as well as in violation of established rules, to follow counsel in the line of discussion adopted and decide questions raised for the first time in this Court.

"It became material to locate the old channel of the creek or branch meandering through the disputed lands for the purpose of establishing boundaries." Such is the language of the statement of the case on appeal. But it appears from the testimony and exhibits that, prior to the year 1858, and back to the year 1840, the land on both sides of the creek belonged to Andrew Carriker. David McEachern conveyed to Andrew Carriker on the 28th of February, 1840. There was a partition of the lands of Andrew Carriker in 1858, and it is admitted that the plaintiff is the owner of

lot No. 1 and the defendant of lot No. 2, as set apart to his heirs in that proceeding. The two lots mentioned call for running with the creek sixty-four poles from a certain sycamore to a white oak. The first cause of action depends upon the location of this dividing line between the two tracts. It is clear that the bed of the creek, as it ran in the year 1858, was the boundary line at the time of the division of the land. The whole of the stream between the two corners mentioned had belonged to Carriker, the common source of title, before the partition. Since the creek was first constituted a dividing line, it may be that its course between two points has changed slowly, and by imperceptible degrees, so as to give one or the other of the riparian proprietors the benefit of accretions, or there may have been a sudden and very apparent change or no alteration in the channel at all since the year 1858, in either of which contingencies last mentioned, the original dividing line would remain where it was first located. *Halsey* v. *McCormick*, 18 N. Y., 147; *Mulry* v. *Norton*, 100 N. Y., 424; *County of St. Clair* v. *Livingston*, 23 Wall., 46; *The Mayor of New Orleans* v. *The United States*, 10 Peters, 662; *Spigener* v. *Cooner*, 64 Am. Dec., 755; Gould on Waters, § 155; *Gernish* v. *Clough*, 48 N. H., 9 (97 Am. Dec., 561); *Lynch* v. *Allen*, 4 Dev. & Bat., 62.

It was clearly incompetent to admit testimony tending to show where the creek ran in the year 1845, when Andrew Carriker owned the land on both sides and it was not a boundary. *Jones* v. *Johnston*, 18 Howard, 150. It was first made a dividing line between two shares in the allotment of the lands of Carriker in 1858, and it was material only to know where the bed of the creek *then* ran, and if any changes had since occurred, when and how they were made, whether slowly and imperceptibly or suddenly and sensibly, whether brought about by natural or artificial agencies. Andrew Carriker might have diverted the channel of

the creek on his own land, so far as we can tell, between the year 1845 and his death, just prior to 1858, or there may have been a very considerable change in its course, produced by natural causes between the year 1845 and the time when it was adopted as a dividing line by the commissioners appointed to make the partition. Proof of the location of the stream in 1845 was not competent evidence to show where it ran in 1858, when it first became a boundary line. *Lynch* v. *Allen, supra.* It is a matter of common observation, that the channels of branches and small streams (and this is called in the statement a branch or small creek) are easily and frequently changed, and cannot be considered permanent landmarks. *Hurley* v. *Morgan,* 1 Dev. & Bat., 425. We have no information from which we can form an accurate opinion as to the exact size of the stream. The testimony was calculated to mislead the jury in determining the location of the dividing line, and there must be a new trial as to the first and second issues.

The third cause of action is predicated upon the concession that the defendant was the owner of the land upon which he built the wall, but constructed it so that he damaged the plaintiff by unlawfully causing an overflow of the latter's land. The defendant requested the Court to instruct the jury, among other things, as follows:

"2. If the jury believe that the defendant only erected a dam of sufficient size to protect his own lands from the ill effects of the dam which was erected by Wilhelm on the south side of the creek, the plaintiff is not entitled to a verdict."

The Court gave the second instruction, modified, as follows:

"While it is true that a riparian owner may erect bulwarks to protect his property from injury by the stream, yet he can only do so when, by the exercise of reasonable care, it can be done without injury to others."

There was error in adding the qualifying clause to the instruction asked. It is true, as a general rule, that a riparian proprietor of land is restricted in the management of his property by the maxim, "*Sic utere tuo ut alienum non laedas*," and cannot, therefore, take the initiative and construct a dam on a stream that will cause the water to overflow and injure the land of his neighbor, that may lie opposite or above his own premises, either when the water is at its usual height or in an ordinary freshet, or that so obstructs its flow as to prevent the land of the other riparian owner from being properly drained. *Pugh* v. *Wheeler*, 2 Dev. & Bat., 50; *Johnstone* v. *Roane*, 3 Jones, 523; *Burnett* v. *Nicholson*, 86 N. C., 99; *Cagle* v. *Parker*, 97 N. C., 271.

But it seems that in this case the plaintiff first constructed a dam on the south side of the creek, and the defendant subsequently built one on the north side lower down. The defendant contended that he was forced to put up his dam to protect his land from overflow caused by the erection of that above by plaintiff, and offered evidence to sustain his contention, and to show that it protected his own, while it did not cause injury to the plaintiff's land. On the other hand, the plaintiff rested his demand for damage upon the evidence tending to show that the defendant's dam caused the water to "*eddy*," and "that much more water in an ordinary freshet would thereby overflow" the former's lands. We think that the Court erred in refusing to give the instruction asked, and numbered 2, either in words or substance, and without the misleading addition appended to it.

If the defendant's evidence was sufficient to satisfy the jury that the plaintiff first built a wall on his side of the creek, and thereby caused the water to overflow the defendant's land on the other side, and lower down, the defendant had a right to build a dam on the north bank to stop the overflow brought about in that way, and if, in effecting that object, it became necessary to obstruct the flow of water in

the creek, and cause it to "*eddy*" so as in freshets to flood more of plaintiff's land than had previously been covered in freshets, the defendant was not answerable in damages for such additional overflow. *Avery* v. *The Empire Woolen Co.*, 82 N. Y., 582; *Nield* v. *L. & N. W. R. R. Co.*, 10 Tan. Rep., 4; Gould on Waters, § 159.

If one riparian owner divert the water by a structure on his own bank, and drive it into the field of his neighbor on the opposite side, so as to force the latter to erect a wall to stop the water-break, the former cannot maintain an action for damages if the wall put up for the protection of the latter cause the water to "eddy," or, in time of freshets, to overflow another part of the former's land. There is a want of clearness—indeed, some confusion—in the discussion that we find in the authorities of the liability of riparian proprietors incurred in erecting levees on their own land and on the bank of a stream. It may be that distinctions will hereafter be drawn between the rights and liabilities of the owner, when the structure is in the nature of a levee intended for the protection of his own fields, and those of one who erects a wall, extending wholly or partially across the stream, so as to obstruct its natural flow, perceptibly, even when it is not swollen.

Under the instruction given by the Court, though the jury might have thought Burleyson's dam absolutely necessary to protect his land against the overflow produced by the previous building by Wilhelm of one on the opposite bank of the creek, they were, nevertheless, bound to find the issue in favor of the plaintiff if they believed from the evidence that Burleyson's dam caused the water to break over at another point and flood Wilhelm's land. There was error also in the instruction given, for which the verdict upon the issues raised by the pleadings as to the third cause of action should have been set aside, and there must be a new trial as to all of the issues.

Error.　　　　　　　　　　　　　　New trial.