MICHAEL MULRY, Respondent, *v.* JOHN S. C. NORTON Appellant et al., pellant.

To give to a littoral proprietor title to land by accretion, the increase must be by such imperceptible degrees that, although persons are able to perceive from time to time that the land has encroached on the sea line, they could not perceive the progress at the time it was made.

While the title of such a proprietor is liable to be lost by erosion or submergence, the erosion to effect that result must be accompanied by a transportation of the land beyond the owner's boundary, and it may be returned by accretion, in which case the ownership temporarily lost may be regained ; and so, land lost by submergence may be regained by relic-

tion, unless the submergence has been followed by such a lapse of time as precludes the identity of the land from being established.

If, after a submergence, the water disappears from the land either by its gradual retirement or the elevation of the land by natural or artificial means, the proprietorship returns to the original owner.

No lapse of time during which the submergence has continued bars the right of the owner to enter upon the land reclaimed and assert his proprietorship when the identity can be established by reasonable marks, or by situation, extent of quantity and boundary on the firm land.

And so if an island forms upon the land submerged, it belongs to the original owner. The sovereign succeeds to the ownership of such islands and formations only as are originally created and located in tide-ways outside of the boundaries of property which has been the subject of individual ownership.

The owners of adjacent uplands are entitled to lands formed by accretion or reliction in front of and contiguous to their property in certain proportions according to the formation of their respective shore lines. However such formations may be commenced or continued, the right of one owner of the uplands to follow and appropriate them ceases when the formation passes the line of his coterminous neighbor.

In an action wherein the question was as to the ownership of a portion of the ocean beach at Far Rockaway, Long Island, it was conceded that the beach in question was within the boundaries, and, with the exception of a lagoon now between it and the upland, is in the same shape as it was in 1685, when it was conveyed by its Indian owners to grantees under whom plaintiff claimed. Some three or four miles east of this land was an island named Long Beach, bounded on the east by an inlet from the ocean to Hampstead bay. No substantial change occurred up to 1835; from that time up to 1869 the beach from opposite the island to the west of plaintiff's land underwent a succession of changes; it was overflowed and washed away, bars, shoals and islands were formed and were constantly undergoing changes. Portions of the beach in front of plaintiff's lands were submerged, but at all times there were bars, shoals or islands. The inlet was removed to the west of plaintiff's land, not by gradual progression, but by sudden, frequent and violent changes, in the end forming a continuous bar from Long Beach to a point west of plaintiff's land. About 1869 the inlet to the west became closed up, and the original one adjoining Long Beach was reopened, leaving a continuous beach to the westward, with a narrow lagoon or cove inside of it running across plaintiff's land and separating the beach from the mainland. Long Beach belonged to the town of Hempstead. Defendants claimed the right to the possession of the beach in front of plaintiff's mainland under a lease from said town. *Held,* that the town acquired no title to the beach in question, but that the title thereto was in plaintiff.

The complaint alleged, among other things, and it appeared that plaintiff was the owner of a hotel upon his premises resorted to by visitors for

surf-bathing and sea air, which required undisputed control of the beach in question, and prevented the exclusion of intruders by any substantial barriers; the beach he had leased to tenants, who maintained bathing-houses thereon. Defendants, claiming under said lease, had made repeated efforts to take possession of the beach, and threatened to oust plaintiff and his tenants, thus impairing the rental value of the property and occasioning serious damage; that defendants were not of sufficient pecuniary responsibility to respond in damages. *Held*, that a case was established authorizing the intervention of a court of equity to quiet the title and to restrain defendants from interfering with plaintiff's possession.

(Argued October 15, 1885 ; decided November 24, 1885.)

APPEAL from judgment of the General Term of the Supreme Court, in the second judicial department, entered upon an order made February 15, 1883, which affirmed a judgment in favor of plaintiff, entered upon a decision of the court on trial at Special Term. (Reported below, 29 Hun, 660.)

The complaint in this action alleged in substance that plaintiff is the owner in fee of certain premises at Far Rockaway, Queens county, upon which there is a hotel ; that a portion of the premises are beach lands which plaintiff has let, with covenants of peaceable possession, to tenants who maintain thereon bathing-houses and other buildings necessary for surf-bathing, and plaintiff receives large rents therefrom, and the said beach-lands are of great value as a necessary appurtenance to his hotel. That the town of Hempstead, without any legal right or authority, has executed to defendant Norton a lease of said beach-lands, a one-third interest, in which lease said defendant has assigned to defendant Levy. That under the lease said defendants threaten and propose, and have made repeated efforts to take possession of the leased lands and to oust plaintiff and deprive him of the possession and use thereof, thereby inflicting great and irreparable damage upon him and his tenants. That defendants are pecuniarily irresponsible, etc.

The judgment demanded is that the lease be declared void, and that defendants and all persons claiming under them be restrained from taking or attempting to take possession of said beach lands. The original conveyance under which plaintiff

claims bounded the lands conveyed on the south by the Atlantic ocean.

The facts appearing on the trial are substantially set forth in the opinion.

*William N. Dykman* for appellant.    In a case where no legal title is shown by either party, the party showing the prior possession in himself, or those through whom he claims, will be held to have the better right.    Such prior possession is a sufficient title to enable a party to recover in ejectment against an intruder, and even against one whose claim of title is founded on a later possession.    (*Hunter* v. *Starin*, 26 Hun, 529; *Whitney* v. *Wright*, 15 Wend. 171; Tyler on Eject. 72.)    When plaintiff asked for an injunction to protect real estate, he assumed the burden of proving he was the fee owner.    (*Eldridge* v. *Hill*, 2 Johns. Ch. 281; *W. P. I. Co.* v. *Reymert*, 45 N. Y. 703; *Broiestedt* v. *S. S. R. Co.*, 55 id. 220; *Nicoll* v. *Trustees, etc.*, 1 Johns. Ch. 166; High on Inj., § 460.)    It was error to hold that spite of its submergence, the mainland proprietors still owned their lands, now parcel of the ocean bed, and could hand down their title, and that whatever grew and rose high and dry on this part of the ocean bed was theirs.    (*Trustees, etc.* v. *Kirk*, 84 N. Y. 215–8; 2 Blackst. Com. 262; *In re Hull & S. R. Co.*, 5 M. & W. 327; *Scratton* v. *Brown*, 4 B. & C. 498; 3 Washb. on Real Prop., 58.)    As the ocean carried sand and soil and deposited it on the west end of Long Beach island, and it grew to the west and extended over this comparatively new ocean bed, the formation is alluvion.    (*Rex* v. *Lord Yarborough*, 3 B. & C. 91; Woolrych's Law of Waters, 56; Angell on Tide Waters [1st ed.], 58; Hale's De Jure Maris, Hargrave's Tracts, 14; Angell on Tide Waters [2d ed.], 266; 2 Blackst. Com. *262; *Emans* v. *Turnbull*, 2 Johns. 322; 5 Hall's Am. L. J. 190; Comyn's Dig., title Prerogative, Derelict Lands; Washb. on Real Prop. 58; Angell on Tide Waters [1st ed.], 71.)    The test for title to land made by alluvion is contiguity.    This must be fatal to plaintiff's claim, for the increase in question arose from the water little by little adjacent to Hempstead's island, Long

Beach, and separated from plaintiff's land by navigable water. (*Saulet* v. *Shepherd*, 4 Wall. 502; Justinian's Inst. 2, 1, 20; Justinian's Dig. 41, 1, 7, § 1; Angell on Tide Water [2d ed.], 249; 5 Hall's Am. L. J. 40.) The findings of fact disclose no ground for relief by injunction. (Edw. on Inj. [1st Am. ed., 1822], 136, 137, 138; *Jerome* v. *Ross*, 7 Johns. Ch. 315.) The cause of action was simple trespass, and in violation of the Constitution it was taken from the common-law courts. (*Stevens* v. *Beekman*, 1 Johns. Ch. 318; *Gentil* v. *Arnold*, 38 How. Pr. 94; *Marshall* v. *Peters*, 12 id. 218; *Akril* v. *Selden*, 1 Barb. 316; *T. & B. R. Co.* v. *B., etc., R. Co.*, 86 N. Y. 107; *McHenry* v. *Jewett*, 90 id. 58; High on Inj., § 460.) Something lessening the future value of the easement must be shown to warrant the granting of an injunction. (R. S. 750, § 8.) Where the plaintiff and defendant show possession as here, the presumption is in favor of him whose possession was prior to the other. (*Hunter* v. *Starin*, 26 Hun, 529; 1 R. S. 744, § 3.)

*John E. Parsons* for respondent. The beach in question did not grow by accretion to Long Beach. (*Rex* v. *Lord Yarborough*, 3 Barn. & Cres. 91; Bacon's Abr., title Prerogative.) Land emerging from the sea within the bounds of the original owner belongs to him. (2 Blackst. Com. 262; Collis on the Statute of Sewers [A. D. 1622], 51; 7 Jac., per Cooke, & Foster Rol. Abr., Prerogative, Le Roy [ed. 1685], 168; Angell on Tide Waters, 76, 77, 79, 80; Hargrave's Law Tracts [Sir Matthew Hale's De Jure Maris], 36, 37; *Murphy* v. *Norton*, 61 How. Pr. 197.) Possession of real estate is *prima facie* evidence of the highest estate in the property, viz., a seizin in fee, and implies a right to possession. It presumes title. It is conclusive, except as against one who proves a better title. (3 Phillips on Ev. 595; Gerard's Titles to Real Estate [2d ed.], 642; *Smith* v. *Lorillard*, 10 Johns. 339; *Jayne* v. *Price*, 5 Taunt. 326; *Sherry* v. *Frecking*, 4 Duer, 452; *Alexander* v. *Pendleton*, 8 Cranch, 462; *Ricard* v. *Williams*, 7 Wheat. 59; *Jackson* v. *Porter*, Paine's C. C. R. 457; *Preston's Heirs* v. *Bowman*, 6 Wheat. 580; *Blunt* v. *Aiken*,

15 Wend. 522; *Hill* v. *Draper*, 10 Barb. 454; *Dickinson* v. *Smith*, 25 id. 102.)   That equity shall exercise jurisdiction, all that is required is that plaintiff shall be in possession. (*Lowndes* v. *Bettle*, 33 L. J. Ch. 151; *Stamford* v. *Hurlston*, L. R., 9 Ch. App..116.)   Plaintiff showed a right to relief in equity and upon various grounds. (*Brown* v. *Brown*, 1 Barb. Ch. 189–217; *Am. Ins. Co.* v. *Fisk*, 1 Paige, 90 ; *Phillips* v. *Thompson*, 1 Johns. Ch. 131; *Nichol* v. *Town of Huntington*, id. 166; *Crary* v. *Smith*, 2 N. Y. 60; *Mayne* v. *Griswold*, 3 Sandf. 463; *Truscott* v. *King*, 6 N. Y. 147 ; *Watson* v. *Sutherland*, 5 Wall. 74 ; *Grant* v. *Crow*, 47 Iowa, 632; *Clarke* v. *J. R. R. Co.*, 44 Ind. 248; *Livingston* v. *Livingston*, 6 Johns. Ch. 497; *Belknap* v. *Belknap*, 2 id. 463; *Heart* v. *Mayor*, etc., 9 Wend. 571; *Spear* v. *Cutler*, 5 Barb. 486; *Gilbert* v. *Arnold*, 30 Md. 29; *De Veney* v. *Gallagher*, 20 N. J. Eq. 33; *Kinder* v. *Jones*, 17 Ves. 110 ; *Thomas* v. *Oakley*, 18 id. 184; *Crockford* v. *Alexander*, 15 id. 138 ; *Mitchell* v. *Dors*, 6 id. 147; *Courthope* v. *Mappleden*, 18 id. 290 ; Story's Eq., §§ 916, 918, 928, and note 2; *Southmayd* v. *McLaughlin*, 9 C. E. Green, 181; *Richardson* v. *Scott*, 47 Miss. 236 ; 2 Waterman on Trespass, 571; *Gibbs* v. *McFadden*, 39 Iowa, 371; *L. Fer. Co.* v. *L. I. & Fer. Co.*, 82 N. Y. 476 ; *Corning* v. *Troy I. and N. Factory*, 40 id. 191.)   If the plaintiff can maintain the action on his possession; if he has made out title; if the claim of title by the defendant Norton fails, it becomes unnecessary to consider any of the other questions presented. (3 R. S. [5th ed.] 30, § 167; *Coke's Cases*, 4 Coke, 80; *Leddon* v. *Senate*, 13 East, 63 ; *Burney* v. *Keith*, 4 Wend. 502; Platt on Covenants, 40, 312; *Tone* v. *Bruce*, 11 Paige, 566 ; *Mayor*, etc., v. *Mabie*, 13 N. Y. 151.)

RUGER, Ch. J.   This action involves the title to certain beach lands on the ocean shore at Far Rockaway.   No dispute arises over the boundaries of the plot, or the location of the beach, as being included within the description of the deeds under which plaintiff's grantors formerly occupied the premises, but it is claimed that the earth or sand composing the beach has been

so affected by the storms and tides of the ocean that its owner-
ship was lost by the plaintiff's grantors, and subsequent de-
posits, made within the same boundaries, were acquired by
the owners of Long Beach, an island belonging to the town
of Hempstead. This result is attempted to be supported
under the rule governing the acquisition of real property
by alluvion or accretion. The evidence tends to establish
the following facts: That the beach in question is within the
same boundaries, and, with the exception of a narrow lagoon
running crosswise through it, is of the same form and shape
now as it existed from the year 1685, when it was conveyed to
the plaintiff's remote grantors by its Indian owners, to about
the year 1835. Between 1835 and 1869 the changes in the
surface of the ground took place which it is claimed worked
the transfer of the ownership. At the commencement of the
process of change, Long Beach consisted of a small island lying
southward of Hempstead bay, separated on the west from the
beach in dispute by a navigable inlet called indifferently Hog
Island, or East Rockaway Inlet, or Brockle Face Gut, and a
succession of beaches, islands, shoals and channels, extending
some four miles. This inlet was about half a mile broad and
communicated directly with the westerly end of Hempstead bay.
To the west of the inlet a bar or beach known as Coot's bar
extended from the mainland south to a point opposite to Long
Beach, forming the westerly shore of Hempstead bay, and from
thence west a distance of about three miles until it reached
the westerly line of the town of Hempstead. The beach to the
westward of the inlet, during the period from 1835 to 1869,
underwent a succession of changes which it is quite unimportant
if not impossible, to follow in detail, but usually consisted of
a line or group of bars, shoals, islands and channels extending
from the inlet to the shore of the mainland beyond the prem-
ises in dispute, but which were constantly undergoing physical
changes by the influence of the laws to which they were natu-
rally subject. These bars, shoals and islands were from the opera-
tion of the tides and wind in filling the channels, separating
them, occasionally joined together, and at one time by the re-

moval of the inlet in question to the westward formed a con-
tinuous bar from Long Beach to a point west of the premises
in dispute, and remained in that position for about three years.
The removal of the inlet to the west was not uniformly effected
by gradual progression, but frequently advanced in "jumps" of
a quarter to a half a mile in distance, and frequently added or
took away from the lands to which they were joined sections of
beach covering half a mile or less in extent as the result of a
single storm. During the period of time in question various in-
lets at different points upon this bar, were broken through from
time to time, and were used by vessels trading in Hempstead
bay until they were closed up by the action of the tide and
wind, when other channels, by the operation of natural causes,
would be opened in new places, and these openings would in
turn become the channels through which vessels bound to and
from Hempstead bay would pass.

About the year 1869 the inlets to the westward became closed
up, and the original inlet adjoining Long Beach was reopened
and has since become the sole channel of navigation for vessels
entering the bay from the east. The process described finally
resulted in attaching the beach in litigation to the mainland on
the west, and forming a continuous beach about one thousand
feet broad from such mainland to the inlet at Long Beach,
being a distance of about four miles. This process also left a
shallow and narrow lagoon or cove running inside of the beach ·
in question from Hempstead bay to a point a little to the west-
ward of the premises in dispute and separating the ocean beach
proper from the mainland lying directly behind it.

In 1725 the formation of Coot's bar was of so permanent a
character that it became the subject of a grant from its owner,
the town of Hempstead, to one Hicks, and from that time to
the present the said Hicks and his heirs and grantees have
occupied and enjoyed the beach lying between the original
Hog Island inlet and the west line of the town of Hempstead
and reaching within about eighteen hundred feet of the prem-
ises in dispute. Portions of this beach have at times been
submerged or washed away, and it has at times been cut into

by the formation of new inlets to Hempstead bay, but at all times there has been some beach lying above the ocean tides, but outside the line of high-water mark capable of occupation and enjoyment by its owners.

Under these circumstances the trial court refused to find that the extension of Long Beach to the westward was made by the process of accretion, and held as a question of law that the defendant's lessors, the town of Hempstead, did not acquire title to the land in dispute by that process, and we concur in the conclusion reached by it.

There seems to be but little conflict in the authorities or even between counsel in this case as to what constitutes alluvion or accretion. It was held in *Rex* v. *Lord Yarborough* (3 B. & C. 91) " that accretion is an increase by imperceptible degrees." " The lord of the manor claims when there is a gradual accession to land adjacent." (Wash. on Real Prop. 58.) " The test of what is gradual as distinguished from what is sudden seems to be that, though witnesses are able to perceive from time to time that the land has encroached on the sea line, it is enough if it was done so that they could not perceive the progress at the time it was made." (Angell on Tide Waters [1st ed.], 71.) It was said in *Emans* v. *Turnbull* (2 Johns. 314) " that, if the marine increase be by small and almost imperceptible degrees, it goes to the owner of the land; but if it be sudden and considerable it belongs to the sovereign." (Citing 2 Blackst. Com. 261; Harg. Law Tracts, 28.) " To acquire title to land by alluvion, it is necessary that its increase should be imperceptible." (*Halsey* v. *McCormick*, 18 N. Y. 147.)

It would seem from these definitions that two insuperable objections exist to the claim of the appellant; one being that a large part of the formations, of which the beach in question now consists, was created anterior to the junction thereof with Long Beach and constituted property subject to acquisition and ownership by others prior to plaintiff's claim; and secondly, that the mode of progress of Long Beach to the westward was frequently by sudden removals of the inlet, and the consequent junction of large and perceptible sections of beach to the east-

erly lands—as the result of a sudden and violent operation of the tides. We, therefore, think the court below correctly held that the defendant did not acquire a legal right to the possession of the lands in question by his lease from the town of Hempstead.

It is also claimed by the appellant that even if he has failed to establish title in himself to the premises, that the plaintiff still is not entitled to maintain this action because of defects in his own title. It is argued that the beach in question having been once cut off from the mainland and surrounded by navigable water, thereby became an island, which, like other formations of land in tide water, was the property of the State.

The evidence establishes a continuous chain of title to the premises in dispute from its native Indian owners down to the plaintiff, covering a period of two hundred years, and each conveyance bounding its grantee upon the Atlantic ocean. Under the law of this State such a description makes the line of high-water mark the boundary of the granted premises, but it also carries with it the liability of such a line to fluctuate by the action of the water. These lines of description for a period of one hundred and fifty years included the *locus* in dispute, and the same, with the uplands, was occupied and enjoyed by the plaintiff's grantors and now remain the property of the plaintiff, unless the title thereto has been lost to his grantors through the causes referred to.

It is undoubtedly true that the proprietorship of lands may be lost by erosion or submergence. The one consisting of a gradual eating away of the soil by the operation of currents or tides, and the other of its disappearance under the water and the formation of a navigable body over it. The plaintiff's grantors have at all times since 1684 remained the owners and occupants of the mainland adjacent to the beach in dispute, and as such owners have been entitled to the rights which attend the title of littoral or riparian owners. " They would be entitled to whatever should be gained from the sea by alluvion or dereliction, and their title was liable to be lost by the advance of high-water mark, bringing their lands within the ebb and

flow of the tide." (*East Hampton* v. *Kirk*, 84 N. Y. 218; 2 Blackst. Com. 262; *In re Hull & Selby Ry.*, 5 Mees. & Wels. 327.) It is not, however, every disappearance of land by erosion or submergence that destroys the title of the true owner, or enables another to acquire it, for the erosion must be accompanied by a transportation of the land beyond the owner's boundary to effect that result, or the submergence followed by such a lapse of time as will preclude the identity of the property from being established upon its reliction. Land lost by submergence may be regained by reliction, and its disappearance by erosion may be returned by accretion, upon which the ownership temporarily lost will be regained.

When portions of the mainland have been gradually encroached upon by the ocean so that navigable channels have been extended thereover, the people, by virtue of their sovereignty over public highways, undoubtedly succeed to the control of such channels and the ownership of the land under them in case of its permanent acquisition by the sea. It is equally true, however, that when the water disappears from the land, either by its gradual retirement therefrom or the elevation of the land by avulsion or accretion, or even the exclusion of the water by artificial means, its proprietorship returns to the original riparian owners. (Angell on Tide Waters, 76, 77; Houck on Rivers, § 258.) Neither does the lapse of time during which the submergence continues bar the right of such owner to enter upon the land reclaimed, and assert his proprietorship. (Angell on Tide Waters, 77–80, and cases cited.) It is said in Hargraves' Law Tracts (Sir Matthew Hale's *De Jure Maris*), 36, 37: "If a subject hath land adjoining the sea, and the violence of the sea swallow it up, but so that yet there be reasonable marks to continue the notice of it, or though the marks be defaced, yet if by situation and extent of quantity and bounding upon the firm land the same can be known, though the sea leave this land again, or it be by art or industry regained, the subject does not lose his property, and accordingly it was held by COOKE and FOSTER, M. (7 Jac. C. B.), though the inundation continue forty years." "But if it be freely

left again by the reflex and recess of the sea, the owner may have his land as before, if he can make it out where and what it was ; for he cannot lose his propriety of the soil though it be for a time become part of the sea, and within the admiral jurisdiction while it so continues." And again : " As touching islands arising in the sea or in the arms of creeks or havens thereof, the same rule holds which is before observed touching acquests by the reliction or recess of the sea, or such arms or creeks thereof. Of common right, and *prima facie* it is true they belong to the crown, but where the interest of such *districtus maris*, or arm of the sea or creek or haven, doth in point of property belong to a subject, either by charter or prescription, the islands that happen within the precincts of such private propriety of a subject will belong to the subject according to the limits and extents of such propriety." (See, also, Gould on Water, § 166.) A case quite in point is referred to by the respondent's counsel as arising in Delaware in 1815, decided by the Court of Common Pleas upon a learned opinion by Judge WILSON, a copy of which is attached to the plaintiff's brief. The case does not seem to be elsewhere reported. It arose over the ownership of an island called Wilson's Bar, which had been created by alluvion upon land formerly contained within the boundaries of an island called Little Tinnicum, but which at some time had been worn away by the ocean. The court say : "The right to the new island and also to land gained by alluvion or dereliction, all of which are governed by the same principle, follows the right to the soil which is covered by the water. Though the surface of the lower part of Little Tinnicum was destroyed by the force of the winds and the waves, and it was consequently overflowed by the water of the river, yet the owner did not lose the propriety of the remaining land covered by the water if it was regained either by natural or artificial means, it continued to belong to the original proprietor." " The earth deposited on it became his by the right of alluvion, and of course this island formed on it by such deposit became his. And though it probably has extended

beyond the limits of the old island, the addition is plainly alluvion."

It would seem also to follow as the necessary consequence of these rules that the existence of the lagoon between the plaintiff's hotel property and the beach constitutes no obstruction to his proprietorship of the beach formation, however created, if located within the original boundaries of his possession. (*Deerfield* v. *Arms*, 17 Pick. 43.) It was held in the case of *Railroad Co.* v. *Schurmeir* (7 Wall. 272) that a sand bar in the Mississippi river divided from the mainland by a slough twenty-eight feet wide, and which at high water was entirely submerged, belonged to the riparian owner, although the acts of Congress made the river a public highway at the place in question. It is also said that "rocks and shoals lying along the margin of navigable fresh rivers belong to the riparian owners." (Gould on Water, § 77.)

The evidence in the case and the findings of the trial court concur in establishing the fact that during the period of change hereinbefore mentioned portions of the beach in front of plaintiff's premises became submerged, but at all times there existed upon or near such premises, shoals bars or islands, which afterward became the nucleus around which gathered the deposits now composing the land subject to litigation. It seems to us clear that the owners of this property did not lose their title thereto by reason of the changes described, and that the State has not acquired any property therein. The sovereign succeeds to the ownership of such islands and formations only as are originally created and located in tide-ways outside of the boundaries of property subject to individual ownership.

We are also of the opinion that the principles applicable to the apportionment of lands formed by accretion among the owners of contiguous uplands is quite controlling as to the rights of the respective parties in this case. Such owners are entitled to lands made by accretion or reliction in front of their property and contiguous thereto in certain proportions according to the formation of their respective shore lines. (Houck on Rivers, § 162; 3 Wash. on Real Prop. 58; Angell on

Tide Waters, 171.) However such accretions may be commenced or continued, the right of one owner of uplands to follow and appropriate them ceases when the formation passes laterally the line of his coterminous neighbor. " A littoral proprietor, like a riparian proprietor, has a right to the water frontage belonging by nature to his land, although the only practical advantage of it may consist in the access thereby afforded him to the water for the purposes of using the right of navigation. This right is his only and exists by virtue and in respect of his riparian proprietorship." (Gould on Water, § 149; *Buccleuch* v. *Metropolitan Bd. of Works*, L. R., 5 H. L. 418.)

The principles upon which the rights of littoral proprietors to lands reclaimed from the sea are determined have been frequently discussed in cases arising in our sister States, but those discussions are not important here, and the cases are referred to only for the purpose of showing that such reclamations are apportionable among the littoral owners according to the lateral lines of upland possessed by them. (Gould on Waters, §§ 162, 163, 164 and 165; *Deerfield* v. *Arms*, 17 Pick. 43; *Wonson* v. *Wonson*, 14 Allen, 85; *Thornton* v. *Grant*, 10 R. I. 477; *Emerson* v. *Taylor*, 9 Greenl. 44.) These authorities were cited and approved in *O'Donnell* v. *Kelsey*, 4 Sandf. 202; affirmed in this court, 10 N. Y. 412. See, also, Angell on Tide Waters, 258.)

It would seem to follow from the principles referred to that the owner of Long Beach could not, even if the process of its enlargement and extension was effected by accretion, claim beyond the point where such accessions began to be made adjacent to the property of adjoining owners, and as the line of each successive owner of uplands was reached in the process of extension a new obstacle to the appellant's claim would seem to arise. This result would occur undoubtedly after passing Hog Island inlet as some of the land westerly thereof was originally solid beach, and occupied by the grantees of Hempstead before the extension of Long Beach.

Aside from those discussed no material objection was made

to the judgment appealed from except that concerning the jurisdiction of a court of equity over actions of this character.

The circumstances of the case are peculiar, and we think within established principles entitle the plaintiff to the relief sought. He was the owner of a hotel upon the ocean beach greatly resorted to by visitors in the summer for the benefit of surf bathing and sea air, and which could be enjoyed by them advantageously only by the undisputed control of the beach in question by the owner of such hotel. The use and character of the property was such that intruders thereon could not be excluded by substantial barriers, and a remedy against them by an action of trespass would necessarily be of doubtful success, and probably afford an inadequate indemnity for the injuries inflicted. During a long period of time successive efforts have been made by the defendant and his lessors to obtain possession of the premises in dispute and occupy them to the exclusion of the plaintiff. Actions have been threatened against him and claims of title made, which constitute a serious annoyance to the owner and impairment of his ability to derive an adequate compensation for the use and rental of such property. The defendant Norton transferred an interest in his lease to the other defendant Levy in order to multiply the claimants to the beach, and the prospect of successive litigations in connection therewith. These annoyances had continued for a series of years and occasioned damage to the plaintiff's rights of property which could not be easily ascertained or adequately compensated for in an action at law. The evidence also tended to show that the defendant Levy was a person of little pecuniary responsibility and presumably unable to respond in damages for the injury his conduct was liable to inflict upon the plaintiff's rights. Under similar circumstances the jurisdiction of a court of equity to interfere by injunction to quiet the title and prevent an injury for which no adequate remedy exists at law has been frequently exercised and approved by the courts. (Hilliard on Inj., chap. 10, § 1; *Watson* v. *Sutherland*, 5 Wall. 74; *Livingston* v. *Livingston*, 6 Johns.

Ch. 497; *Lacustrine Fertilizer Co.* v. *L. G. & F. Co.*, 82 N. Y. 476; *Hart* v. *Mayor of Albany*, 3 Paige, 213.)

We think this a case where the remedy by injunction was proper, and within the principles laid down in the cases cited.

The judgment should, therefore, be affirmed.

All concur.

Judgment affirmed.