O'DONOHUE et al. v. CRONIN et al.

(Supreme Court, Appellate Division, Second Department. June 7, 1901.)

1. BOUNDARIES—DEEDS—CONSTRUCTION—MAP—ADMISSIBILITY OF EVIDENCE.
     Where a map of premises conveyed is delivered with the deed, it is admissible on an issue as to the land conveyed, as tending to show the intention of the parties.

2. JUDGMENT—RES ADJUDICATA.
     A judicial determination of the ownership of certain premises is not res adjudicata as to a claimant not a party thereto.

3. ADVERSE POSSESSION—SUFFICIENCY OF EVIDENCE.
     Code Civ. Proc. § 369, provides that 20 years' adverse possession under a written instrument purporting to be a conveyance will give title by adverse possession. Section 370 provides that, when a known farm is partially improved, a portion which, according to the usual custom of the country, is not inclosed, is deemed to have been occupied for the same length of time as the improved part. Plaintiff had occupied lands as a farm for over 20 years, which lands had been acquired under a deed including low coast lands, and the former owner had used the coast lands. Plaintiff had erected and used wharves and boat and bath houses and other similar buildings on the lowlands after acquiring a deed thereto, which was the same use to which similar lands were put by the owners thereof. *Held*, that the question of plaintiff's actual possession of the lowlands should be submitted to the jury.

Appeal from trial term, Queens county.

Ejectment by James O'Donohue and others against John F. Cronin and another. From a judgment in favor of the plaintiffs and an order denying a motion for a new trial, defendants appeal. Affirmed.

Argued before GOODRICH, P. J., and WOODWARD, HIRSCHBERG, JENKS, and SEWELL, JJ.

Augustus N. Weller, for appellant Cronin.
Eugene F. Daly, for appellant Lawrence.
Francis Dwight Dowley, for respondents.

GOODRICH, P. J. The action is for ejectment from certain premises on the shore of the Atlantic Ocean at Rockaway Beach, Long Island, which are described in the complaint as follows:
"All that certain piece or parcel of land, meadow, and beach situate at Far Rockaway, in the town of Hempstead, county of Queens, and state of New York, bounded as follows: Beginning at the southeast corner of land formerly of Margaret Smith, deceased, at point distant about thirty-six rods south of the Main Rockaway road, and running from said point easterly two rods across what was formerly the Old Beach road, now closed to the east side of said Old Beach road; thence running by lands sold by the heirs of John Mott, deceased, to Nathaniel Jarvis, Jr., south, nine degrees east, four chains and ninety-eight links to land of James O'Donohue; thence running westerly by said land of James O'Donohue one chain fourteen links and a half, to the northwest corner of said land of James O'Donohue, formerly belonging to Elizabeth B. Bach; thence running southerly a straight line, partly by land of said James O'Donohue and partly by land of said Margaret O'Donohue, about nine hundred and fifty-seven feet four inches to a small ditch or creek in the meadow; thence running southerly by said small ditch or creek to the main creek, called 'Mott's Creek' or 'Bridge Creek'; thence running southerly and easterly by said main creek to a point four rods west of the east line of the New Beach road; thence running southerly a straight line to the main beach or ocean, so that said New Beach road shall be four rods wide from

the said main creek down to the ocean; thence running westerly by the main
or common beach to land formerly of John L. B. Norton, Sr., deceased;
thence running northerly, northwesterly, and northerly around by land and
meadow formerly of said John L. Norton, Sr., until it comes again to said
Mott's or Bridge creek; thence running northwesterly, northerly, and north-
easterly along said Bridge creek, separating this land from meadow of said
John L. Norton, Sr., and meadow and land formerly belonging to the heirs
of Margaret Smith, deceased, until it comes to the head of said creek; thence
running as the fence stands by land formerly belonging to the heirs of Mar-
garet Smith, deceased, north, thirty-two degrees fifteen minutes east, to the
place of beginning,—with the privilege of passing and repassing over said
New Beach road with wagon and team or otherwise out to the said Main
Rockaway road, and also the privilege of a right of way from said land out
easterly to said New Beach road across the northerly end of the land
formerly belonging to Ellen A. Beck, reserving to said Benjamin Mott, his
heirs and assigns, the privilege of passing and repassing over said Beach road
four rods wide along the east side of above land, with wagon and team or
otherwise, down to the ocean."

The complaint alleges that the plaintiff Isabella Amy is the owner
of one-third and the plaintiff Mary A. O'Donohue the owner of two-
thirds of said premises, as tenants in common, and that James
O'Donohue, their father, is tenant by the courtesy, as surviving hus-
band of their mother, Margaret. It will be observed that the descrip-
tion of the eastern boundary refers to a point on the line of Mott's
creek, four rods west of the east line of the New Beach road, and
continues "thence running southerly a straight line to the main
beach or ocean; * * * thence running westerly by the main or
common beach to land," etc. If the plaintiffs' predecessors in title
had the right thus to define their east and south boundaries, or if
they and the plaintiffs have been in adverse possession under claim
of title for 20 years, then the plaintiffs are entitled to recover. The
defendant Cronin claims to be the lessee of the defendant Lawrence,
as executor under the last will of Newbold Lawrence, deceased, under
a lease dated March 15, 1897, to premises "bounded on the east by
Jarvis lane, on the south by the Atlantic Ocean, on the west by
Wells' line, and on the north by Mott's or Bridge creek." This in-
cludes the whole of that part of the premises described in the com-
plaint which lies south of Mott's creek. Cronin also claimed under
lease from the town of Hempstead, made in September, 1896. If
his predecessors had title to the land thus described, and no adverse
possession is proved, he is entitled to a recovery. Mott's creek ex-
tends in a direction generally easterly and westerly across the tract
described in the complaint, dividing it into two nearly equal parts,
which we shall speak of hereafter as the "upland part" and the
"beach part." The litigation arises over the title to the beach part,
there being no question as to the title to the upland. We shall trace
only generally the title of the contesting parties, as, in the view
which we take of the evidence, it was necessary only to show that
the plaintiffs were "claiming a title founded upon a written instru-
ment," and had continued in adverse possession for 20 years.

It is not disputed that all the premises were covered by the Dongan
patent of lands at Hempstead, dated 1685, which granted them to
Capt. John Searing and others, "as patentees for themselves, and on
behalf of themselves and their associates, the freeholders and in-

habitants of the said town of Hempstead." After various mesne conveyances, the property was conveyed to John Mott in 1826. After his death, his heirs partitioned the property, and in 1842 a partition deed was executed between his sons, John and Benjamin, whereby all the premises described in the complaint were conveyed to the latter. Benjamin B. Mott, the same person as Benjamin Mott, conveyed the premises to Margaret O'Donohue in November, 1868, by a deed which contains the description set out in the complaint; and with the deed he delivered a map of the premises, drawn by Fosdick, a surveyor. The map is in the record, and plots the premises as bounded on the south by the ocean. This boundary along the ocean runs to the land formerly of Norton, and thence northerly along his line, which is the Wells line. The map is competent evidence of the intention of the parties to the deed. Clark v. Trust Co., 64 N. Y. 33. The defendants claim title through the Dongan patents as follows: An allotment of lands by the town of Hempstead was made in 1678. In 1725 a conveyance was made by 58 freeholders to Jacob Hicks, which is claimed to include the premises in question. The description reads:

"All our right, title, interest part or share belonging to a Beach lying on ye south side of ye Island in ye bounds of Hempstead, aforesaid at a place called Rockaway bounded as follows West by Whelses line; South by the Sea; East by Brokeface Gut and North by ye great creek. Together with all ye Marshes and other privileges thereunto belonging or in any wise appertaining."

It will be observed also that, as before stated, the Wells line was the division line between the Norton tract and that conveyed to Mrs. O'Donohue. The land descended to Stephen and Jacob, grandsons of Jacob; and their descendants, in 1876, commenced a partition suit, and obtained a judgment under which the land last described was conveyed, in 1878, to Alfred N. Lawrence. Alfred conveyed to Newbold Lawrence, whose executor is one of the defendants. The plaintiffs herein were not parties to the partition suit. In Mulry v. Norton, 100 N. Y. 424, 3 N. E. 581, the question of the ownership of premises at Far Rockaway Beach, as between the plaintiff and the defendant as lessee of the town of Hempstead, was before the court. It appeared that the ocean beach had undergone a succession of changes, whereby the bars, shoals, islands, and channels extending from the inlet to the shore of the mainland were constantly changing, sometimes being joined and sometimes being separated by the removal of an inlet either by "jumps" or gradual progression. The court held that the owners of the upland were entitled to the newly-formed lands made by accretion or reliction in front of their premises and contiguous thereto, in certain proportions according to the formation of their respective shore lines. In Lawrence v. Town of Hempstead, 155 N. Y. 297, 49 N. E. 868, the court decided that Lawrence was the owner of the premises described in the deed of the 59 freeholders to Jacob Hicks. The premises were part of a 1,500-acre tract bounded on the west by the Wells or Whelses line. This line ran down to the ocean, and is the one shown on the Fosdick map, delivered by Mott to Mrs. O'Donohue, as the boundary between

the premises of John L. Norton and the property claimed by each of
the parties to this action. The court said (page 303, 155 N. Y., and
page 869, 49 N. E.): "As to the west boundary 'Whelses' (or Wells')
line,' and the south boundary, the ocean, there arises no difficulty."
Consequently we have the authority of the court of appeals · that
Lawrence was the owner, as against the town of Hempstead, of the
premises in controversy in the present action. The difficulty, how-
ever, as between the present litigants is not judicially determined,
as the plaintiffs were not parties to that action. They also claim
title to the property under the Mott deed, which, while it does not
use the words "Wells line," refers to the Norton tract, which lay just
to the west of the Mott land.

The foregoing statement shows that each of the parties to this
action claimed title under deeds which are of record. This brings
us to the question of adverse possession, and, if the plaintiffs have
shown such possession since the deed to Mrs. O'Donohue in 1868,
their title may not be questioned. It is not essential that the plain-
tiffs should prove an actual and valid title to the premises. It is
sufficient to show that they are holding adversely under a written
claim of title. Section 369, Code Civ. Proc.; Sands v. Hughes, 53
N. Y. 287; Jackson v. Waltermire, 7 Cow. 353. Section 370 of the
Code of Civil Procedure defines adverse possession in part as follows:

"For the purpose of constituting an adverse possession, by a person claim-
ing a title, founded upon a written instrument, or a judgment or decree,
land is deemed to have been possessed and occupied in either of the follow-
ing cases: * * * 3. Where, although not inclosed, it has been used for
the supply of fuel, or of fencing timber, either for the purposes of husbandry,
or for the ordinary use of the occupant. Where a known farm or a single
lot has been partly improved, the portion of the farm or lot that has been
left not cleared, or not inclosed, according to the usual course and custom of
the adjoining country, is deemed to have been occupied for the same length
of time, as the part improved and cultivated."

There was evidence tending to show that John Mott, who died
in 1828, owned a farm of 400 acres, of which the premises in question
were a part, and that they were continuously in the possession of the
Motts until the conveyance to Mrs. O'Donohue, and that the latter
continued in occupation till the commencement of this action. John
Mott, father of John and Benjamin, devised the farm to them, and
there was evidence that during their minority it was cultivated by
their brother Richard, and by them after they became of age. Mott's
creek formed the westerly boundary for some distance. Below that
was a ditch which ran along the Wells boundary from 175 to 200
feet towards the beach. The use of a ditch is a customary method
of defining a boundary in this section of the country. Richard, who
at the time of the trial was about 90 years of age, testified in part
as follows: There was a fence on the Jarvis lane nearly to Mott's
creek, and then a ditch running down towards the beach. The plain-
tiffs' easterly boundary continues in a straight line to the ocean.
The lower part of the property south of Mott's creek was marsh, and
witness cut hay from it for cattle. John Mott, Sr., built a bridge over
the creek, and witness repaired it, and put in a gate. Their cattle
also were pastured there. Some of the land below the creek has

been covered with sand washed up from the ocean, but formerly it was used as a pasture, and in digging through the sand the old meadow is found. The Motts also gave permission to one Hewlett to build bathing houses on the beach just west of Jarvis lane, receiving rent from him therefor from 1830 to 1837; and the receipts therefor are in evidence. The distance from the creek to the ocean is about three-quarters of a mile, and grass grew nearly down to the beach. Since that time an outer beach has formed, and there is an inlet between. The beach and bars have frequently been changed by the action of the waves. Witness beached his yacht just west of the Jarvis lane, and used it as a landing. He also gathered seaweed for manure. After the conveyance to Mrs. O'Donohue in 1868, she occupied the upland as a farm. Between that time and 1896 she had wharves, a float, boat, and bath houses and other small buildings on the north side of the inlet, and these were all used by the family. There was also evidence that the frontage of the plaintiffs' property was used practically in the same way as the adjoining frontage; that is, "according to the custom of the adjoining country." In September, 1896, the town of Hempstead executed a lease to Cronin of all the premises south of Mott's creek. The plaintiffs immediately served upon the town a protest against the lease, on the ground that the property belonged to them, and that they had been in occupation for more than 20 years. They also retained counsel, who commenced proceedings to restrain the construction of a road across the property below the creek, and the work was stopped for a while, but resumed upon the withdrawal of the plaintiffs' opposition.

This is not by any means all the evidence upon the subject of actual possession, but it is sufficient of itself to require a submission of the question to the jury. No evidence appears of any occupation of the disputed territory by the defendants until shortly before the commencement of this action, in July, 1897, soon after the lease of Lawrence to Cronin, when the latter, during the night, erected a "shanty" on the north shore of the inlet, and the defendant Finlay occupied it. In June, 1897, Cronin erected a dock on the beach. The court charged the jury as follows:

"The plaintiffs, however, insist that, whatever obscurity there may be in the ancient deeds with regard to meadows and marshes, and to Wells' line as being the true location of the property in question, the deed of 1868 from Benjamin Mott to the plaintiffs sufficiently establishes their title as resting upon that line. They claim that this land so conveyed by Mr. Benjamin Mott, which was traced by Mr. Fosdick, the engineer, conveys this land by metes and bounds by plain descriptions, and that it is bounded on one side by the sea or the ocean. The plaintiffs say that under that deed they took possession of the upland, and built upon it a home, which they have occupied from that time to this. As to the lowlands, the marshes, and meadows, and the sand adjoining them, they say they did not cultivate these because they could not be cultivated, or would yield nothing if they were cultivated; that they could not fence the beach, as the action of the sea and the tides would destroy fences. But they contend that the upland was useful and tillable, and that in using the upland for a home they used the lowland—the marshes, meadows, and beach—as such lands were commonly used by other people in that vicinity. Whether they used it to gather drift, to get the coarse grass, as an outlook, or to walk upon, they say they used it

in the common way of using that kind of unimproved and waste land adjoining the substantial and useful upland. If you should find that this upland in dispute was not actually included within the deeds which have been offered in evidence by the plaintiffs, the law is that, even where a man receives a deed of property which would not of itself be sufficient to give him a good title, yet, if he enters into possession of the land under a defective deed, claiming to own it under that deed, and he uses it, occupies it, and improves it if it is susceptible of improvement,—that is, if he fences it in case it can be fenced, or, if it cannot be thus improved and occupied, if he uses it either for the purpose of gathering seaweed or otherwise, as it is common to use such land in the immediate neighborhood,—then, by the general use of one portion of the land, the benefit to the other portion inures to him. In other words, by reason of the use of the upland for a home, and of the lowland in front as such lowland is commonly used, both the upland and the lowland are to be considered as being in the possession of the man who has the upland. The plaintiffs claim that they made such use of this land in question. Their witnesses testified with more or less particularity to what was done by them with the land in dispute. If you find that under this deed of 1868 the plaintiffs entered into possession, and continued uninterruptedly in possession, claiming title under that deed to this land, and that they did exercise acts of ownership over the whole land down to the shore, and to the beach as well as to the upland, even though they did not fence in or cultivate the beach, then such use of the lowland in connection with the upland may be considered as possession, with the same effect as if it had been actually fenced and positively occupied. * * * There is nothing further that I can do to assist you in a case of this kind. There are no rules of law applicable to it, excepting the rule which I have given you regarding what is known as 'adverse possession.' The term conveys its own meaning. It must be against others; it must not be with the consent of even the real owner. A man might occupy property for any length of time with the consent of the real owner, and he would never get title as against such owner. It is only when he enters into possession of property claiming to own it as of right under some paper, even though the paper gave him no absolute right. But where he enters claiming under such paper, and remains under that paper adversely against all others, continuously, openly, and uninterruptedly in the way which I have before indicated, for twenty years, he acquires a good title. The reason for this is manifest. The object of the law is to quiet disputes, to end controversies as to the title to land."

The verdict has established the plaintiffs' adverse possession of the premises under written claim of title and on sufficient evidence, and, without passing upon the question of title by written instrument, we think that justice will be best attained by an affirmance of the judgment. If an appeal shall be taken, the court of appeals, which is already familiar with the questions of title involved, will be enabled to dispose of the whole controversy. The judgment should be affirmed.

Judgment and order affirmed, with costs. All concur; HIRSCHBERG, J., in result.