VAN DEVENTER v. LOTT et al.

(Circuit Court of Appeals, Second Circuit. June 14, 1910.)

No. 288.

1. NAVIGABLE WATERS (§ 37*)—HIGH-WATER MARK.
    Where the ocean is called for in a deed as a boundary of land, the boundary is high-water mark.
    [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 212; Dec. Dig. § 37.*]

2. NAVIGABLE WATERS (§ 42*)—LAND FORMED IN SEA—RIGHTS OF OWNERS OF SHORE LANDS.
    Rockaway Beach, on the south shore of Long Island, is a strip of sand between Jamaica Bay and the ocean, terminating on the west at Rockaway Inlet, and for two centuries the western end or point has been gradually lengthened to the westward by accretions caused by the action of the sea. It was formerly to the eastward of Barren Island, but is now to the south of it; the point being about south from the west side. During the same time the south side of the island has been washed away by the shifting of the channel or inlet; but, as shown by a preponderance of the evidence, no part of the present Rockaway Beach is within the original boundaries of the shore owners on the island, which stopped at high-water mark, and the beach has always been, and is now, separated from the island by the navigable inlet half a mile in width. Held, that the extension so formed by accretion is not the property of the shore owners on the island, but of the owners of the beach to which it is attached.
    [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 253–255; Dec. Dig. § 42.*]

3. QUIETING TITLE (§ 13*)—RIGHT OF ACTION—POSSESSION.
    Where the only persons in actual occupancy of a tract of land, the legal title to which was in complainant, were tenants of small portions originally leasing from defendants, who were adverse claimants, but who afterward took leases from complainant, and the only remaining representative of defendants near the property occasionally lodged in a houseboat moored to the shore, his family residing elsewhere, there was no such possession adverse to complainant, as would support an action of ejectment

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

by him, and he was entitled to maintain a suit to quiet title, under Code Civ. Proc. N. Y. §§ 1638-1650.

[Ed. Note.—For other cases, see Quieting Title, Cent. Dig. § 8; Dec. Dig. § 13.*

Necessity of possession in suits to quiet title, see note to Jackson v. Simmons, 39 C. C. A. 522.]

**4.** CHAMPERTY AND MAINTENANCE (§ 7*)—CHAMPERTOUS CONTRACTS—DEED.

A deed conveying the legal title to property is not champertous, when at the time it was executed there was no one in the actual possession of the property, claiming under a title adverse to the grantor.

[Ed. Note.—For other cases, see Champerty and Maintenance, Cent. Dig. §§ 54-110; Dec. Dig. § 7.*]

**5.** COURTS (§ 335*)—SUIT IN FEDERAL COURT—FOLLOWING STATE PRACTICE—EQUITY—RIGHT TO JURY TRIAL.

There is no statute requiring the federal courts to conform to the state practice in equity causes; and the defendant in a suit to quiet title in a federal court is not entitled to demand a jury trial, although it may be provided for by a state statute.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 335.*]

Appeal from the Circuit Court of the United States for the Eastern District of New York.

Suit in equity by Andrew K. Van Deventer against Jurien S. Lott and others. Decree for complainant, and defendants appeal. Affirmed.

Said decree was in favor of the complainant in an action to quiet title to lands situated in the county of Queens, at the west end of Rockaway Beach. The opinion of the Circuit Court was filed July 24, 1909, and is reported in 172 Fed. 574.

Hubbard & Rushmore (George C. Case, of counsel), for appellants John R. and Sarah Lott.

H. M. Gescheidt, for other appellants.

Everett J. Esselstyne (Frederick R. Kellogg and Maxwell Evarts, of counsel), for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

COXE, Circuit Judge. The salient facts are fully stated in the opinion below and need not be repeated here at length. The land in dispute is at the extreme westerly end of Rockaway Beach.

The complainant shows title to the property described in the various conveyances, the earliest dating from 1685. On February 11, 1901, he received the deed executed by Arabella D. Huntington, widow of Collis P. Huntington, and Henry E. Huntington, holding under the last will and testament of the said Collis P. Huntington. Complainant's record title to the lands described in the various conveyances cannot be questioned.

The defendants show title to property on Barren Island, which lies north of Rockaway Point and is separated therefrom by a navigable channel half a mile in width. The property in controversy is not covered specifically by the language of all the deeds of either party,

as it was not in existence in its present location at the time many of them were executed.

The land, or rather the sand, in dispute has, during the last two centuries, been added to the western end of Rockaway Beach by accretion caused by the set of the tides and storms of great severity, until Rockaway Point, which formerly lay to the eastward of Barren Island, is now south thereof and extends, approximately, as far west as the most westerly portion of that island. In other words, Rockaway Beach extends across the southern front of Barren Island, separated by the half mile wide channel before alluded to.

The defendants' contention is that the land in controversy was formerly attached to the southern portion of Barren Island and has, in the process of time, been eroded therefrom by the action of the sea and attached to Rockaway Point which, it is argued, now occupies the same location as was formerly occupied by the southerly portion of Barren Island.

We are of the opinion that the proof does not sustain this contention. The preponderance of evidence, including the maps and government charts, indicates that 75 years ago Barren Island was separated from Rockaway Beach by Rockaway Inlet, a channel over half a mile in width. During these years the tendency has been, sometimes during violent storms, but generally by the slow action of the sea, to lengthen Rockaway Beach in a southwesterly direction until Rockaway Point is 2½ miles further west than it was in the early part of the nineteenth century. During this period Barren Island has been eroded and its southern boundary has receded to the north, but it has not been established that any part of the island thus washed away has been added to Rockaway Beach, which has at all times been separated from the island by a navigable channel ranging in depth from 20 to 60 feet. We are also satisfied that no part of Rockaway Beach, or Rockaway Point, now in controversy, is in territory ever occupied by the upland of Barren Island. In other words, if a line were drawn east and west through the most southerly high-water mark to which the island ever extended, it would be considerably to the north of the most northerly portion of the land in controversy.

There is much confusion and contradiction upon minor points, but we are thoroughly convinced that the following facts are established:

First.—Complainant's predecessors owned in 1685 "the land and meadow commonly called Rockaway Neck situate, lying and being as aforesaid, bounded on the east with Hempstead West Patent line, on the south with the marine sea or ocean to low water mark and on the west with the gut or inlet which makes the bay or sound betwixt Jamaica and the said neck and on the north with the said bay or sound as it runs easterly until it comes to Hempstead line as aforesaid." In other words, we are convinced that complainant's predecessors owned Rockaway Point.

Second.—From 1685 to the date of the trial Rockaway Point has been gradually and imperceptibly working to the west and south.

This has been by accretion and not by avulsion, but the defendants' access to the sea by a navigable channel has never been cut off.

Third.—Rockaway Point and Barren Island, no matter how their conformation may have been changed by the action of the sea, have always been separated by Rockaway Inlet, a navigable channel connecting Jamaica Bay and the ocean.

Fourth.—Certain sand bars in Rockaway Inlet known as Duck Bar, Pelican Bar and by other names, were not a part of Barren Island, but were separated therefrom by waters navigable by small boats.

Fifth.—The land in controversy is physically annexed to and is a part of the complainant's land deeded to his predecessors in 1685. He can walk to every part thereof.

Sixth.—The land in controversy is physically separated from the Barren Island land of the defendants and they can reach no part thereof except by crossing a navigable channel a half mile in width.

Seventh.—The complainant's land is all located in the county of Queens, whereas Barren Island is in the county of Kings, Rockaway Inlet being the dividing line between the two counties. Taxes have been paid on the disputed lands by complainant and his predecessors and not by the defendants or their predecessors.

Eighth.—The titles of the defendants all relate back to the conveyances from Hendrick I. Lott and Nelson Shaw in 1835 who never owned any lands except on Barren Island. In the deed from Jeromus Lott to Hendrick I. Lott the land is described as—

"that undivided tract of land, woodlands, meadows, marshes and beaches commonly called and known by the name of Barren Island, situate, lying and being in the town of Flatlands, aforesaid, said tract of Island being bounded as follows, to wit: Northerly partly by the Indian creek and partly by the bay; easterly by the inlet that separates said island from Rockaway Beach; southerly by the Atlantic Ocean; westerly by the inlet that separates said tract of land from Gravesend."

It will be observed that the deed describes an island which was bounded on the south by the ocean and was separated from Rockaway Beach, as it is to-day, by Rockaway Inlet.

Ninth.—There can be no doubt that the defendants' land was originally bounded on the south by the high-water mark of the Atlantic Ocean. That high-water mark is the boundary, where lands are so described, is abundantly established. Mulry v. Norton, 100 N. Y. 424, 433, 3 N. E. 581, 53 Am. Rep. 206; Ex parte Jennings, 6 Cow. (N. Y.) 518, 528, 16 Am. Dec. 447; Shively v. Bowlby, 152 U. S. 1, 57, 14 Sup. Ct. 548, 38 L. Ed. 331. This being the rule, it is manifest that the defendants' title never extended to the sand bars which formed and shifted from time to time in Rockaway Inlet during the many years that this channel was subjected to the more or less violent action of the sea. Unfortunately for the defendants, this action has favored the complainant; under different conditions the inlet might have worked to the eastward, adding to defendants' land and eroding the land of the complainant. The court cannot, however, reverse the laws of nature and award to the defendants, property which the sea has added to the domain of the complainant.

Tenth.—The deeds under which the defendants claim title referred solely to land on Barren Island until 1887, when one Henry D. Lott executed a quitclaim deed to the defendant Byron Whitcomb of a portion of Rockaway Beach and since then a number of other deeds have been recorded in Queens county. So far as the record title in Queens county is concerned, it begins with the deed to Whitcomb.

These considerations make the decision in Mulry v. Norton, supra, inapplicable. The portion of Barren Island carried away by erosion was transported beyond the owners' boundary, at least it has never been returned by accretion or reliction. The place where it was located is at present under water. The land which the defendants seek to reach is not within their original metes and bounds and there is no possibility of identifying it as ever having been owned by them or as having reappeared within an area so owned by them. Quite likely, if the defendants could show that they once owned the territory where Rockaway Point now is, the doctrine of the Mulry Case would apply; the difficulty is that they have not shown it. The court held in that case that owners of adjacent uplands were entitled to land formed in front of, or contiguous to, their property, but it has never been held that the owner of property, a portion of which has been washed away by the sea, has title to land which has formed over a half a mile distant on the other side of a wide, navigable channel at a place to which his title never extended.

The defendants' contention that in 1855 a storm of unprecedented fury burst over this part of the coast, the sea breaking through Barren Island and forming an inlet, which is now known as Rockaway Inlet, is absolutely in conflict with the charts and is not sufficiently supported by the oral testimony to justify a finding that it has been established. Captain Smith, who is, perhaps, the leading witness on this subject and who was 72 years of age when he was sworn, testified as to events which occurred 50 years prior to the date of his testimony. He says that he lay at the head of Hook creek with a vessel loaded with coal bound for Elizabethport and when he went down in the morning it was blowing a gale. Notwithstanding the unprecedented conditions, he put out to sea and reached Elizabethport, where he remained two days. When he returned he found that "the tide had cut right through Barren Island." The examination continued as follows:

"The main inlet closed up within a week. Q. And attached to what? A. Barren Island went across—that went through Barren Island. Q. And attached to Barren Island? A. It cut right through Barren Island and Barren Island was left to the southward. Q. Did it attach to any part of Barren Island? A. No; it cut right through; it went right through Barren Island. Q. Where did it cut through? A. It cut through in the first place; what we call Pelican; that was the first beach that runs to Barren Island; it cut right through there, and then it widened to the Southwest Way; and then it went—the first cut was through Pelican Way, and the Southwest Way through Barren Island, and then there is another way that goes down to Duck Bar. Q. What part of the island was cut through? A. As near as I can tell it was cut right through the center * * * and left a part of Barren Island out on the ocean front."

The inference to be drawn from his testimony, although we cannot find that he so states directly, is that Barren Island was cut in two, a new navigable channel formed through the center and that the southern part of the island is now Rockaway Point—the land in controversy. That such a cataclysm occurred is inherently so improbable that we should hesitate to accept it, even if corroborated by other witnesses called by the defendants. But it is not corroborated except as to inconsequential details. We have no doubt that Captain Smith intended to tell the truth and it is probable that he was misled by assuming that the shifting bars south of Barren Island were actually a part of the island itself instead of being separated therefrom by four feet of water at high tide. It is unnecessary to review the testimony in detail upon these questions further than to say that we are of the opinion that the preponderance of evidence establishes the propositions heretofore stated.

This suit was brought January 3, 1905, under sections 1638–1650 of the New York Code, which provide for an action to compel the determination of a claim to real property at the instance of a person claiming it in fee who has been in possession for one year. As before stated, the complainant has established title to the land in controversy and is entitled to maintain the action to quiet title unless it appears that the defendants have been in such actual possession as to require an action of ejectment.

The facts regarding the claim of adverse possession are stated in the opinion of the judge of the Circuit Court and need not be repeated here. Suffice it to say that leases to certain tenants were made by defendants, of small lots along the beach. These tenants afterwards took leases from the complainant's predecessors, thereby recognizing his title. Notices forbidding trespassing have been posted from time to time by defendants and a monument was set up on the land in 1887. During the summer months one Smith Foster lived on the property with the consent of the defendants and acted as their agent in certain particulars. He built a lodge and some cabins for sportsmen, which were burned down in 1903 by an order of the court issued in an action commenced by agents of the complainant, which order was subsequently held to be illegal.

At the time this action was commenced, however, Foster had no possession which would justify an action of ejectment. Since his eviction the only structure which he had upon the premises in question was a houseboat which was drawn up on the beach. Here he slept a portion of the time; his family living at the life-saving station, not on the disputed premises. It is difficult to see, therefore, who could have been made defendants in an ejectment action and what result could have been obtained had such an action been commenced. The complainant could not have sued the so-called Lott lessees for the reason that they were his own tenants. He could not have sued Foster for the reason that he was only the occupant of a houseboat, which he occupied occasionally only. It was not his home and could have been floated away at any time.

Complainant could not have sued the defendants in ejectment be-

cause their attempts to establish dominion over the land did not amount to possession within any of the authorities with which we are familiar. When it is remembered that the property in dispute is three miles long and nearly a mile in width, that it is not cultivated, inclosed, improved, or used for the supply of food or capable of such use, it will be seen how inconsequential and trivial would be the occupation of a few small lots along the beach, even if all the defendants' claims were conceded, that they were so occupied.

But in fact the claim of adverse possession must rest upon the so-called possession of Smith Foster. We are asked to dismiss this action, which will settle the title to hundreds of acres, upon the theory that the question can be determined in an ejectment suit against the owner of a wandering scow which was drawn up on the beach and used occasionally by him as a lodging house.

The deed to complainant is not void for champerty. It is enough to say on this subject that at the time of the delivery of the deed there was no one in the actual possession of the property, claiming under a title adverse to that of the grantors.

The defendants argue that they were entitled to a jury trial and that the refusal to grant their request in this regard was error, requiring a reversal of the decree. The action is in equity to quiet title to land and there is no provision of law which gives the defendant the right to a trial by jury in such an action in the federal courts. The law assimilating the practice of the federal courts to that of the state courts expressly excepts equity causes. The provision of the Revised Statutes of the United States is as follows:

"The practice, pleadings and forms and modes of proceedings in civil causes, other than equity and admiralty causes, in the Circuit and District Courts, shall conform as near as may be, to the practice, pleadings, and forms and modes of proceeding existing at the time in like causes in the courts of record of the state within which such Circuit or District Courts are held." Rev. St. § 914 (U. S. Comp. St. 1901, p. 684).

There is no provision for trial by jury of the issues in equity causes in the United States courts, and, therefore, the state statutes and decisions are inapplicable. The judge of the Circuit Court was correct in refusing to follow the practice of the state courts. Assuming that a federal judge might, upon proper application, in such an action, have framed feigned issues for trial by a jury, his granting the request is entirely discretionary and his failure to grant it furnishes no ground for reversal.

The decree is affirmed with costs.