VAN DEVENTER v. LOTT et al.

(Circuit Court, E. D. New York. July 24, 1909.)

**1. NAVIGABLE WATERS (§ 44*)—LITTORAL RIGHTS—LANDS FORMED IN SEA.**

Land within the original boundaries of a shore owner, reformed by the sea after having been washed away, is to be considered as restored rather than as a growth or addition to other property to which the actual accretion may have attached; but new land formed in the sea in front of the property of such an owner beyond the original high-water mark which constituted his boundary, and with a navigable channel between through which the sea may be reached, if not an accretion to different property, belongs to the state.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 266; Dec. Dig. § 44.*]

**2. NAVIGABLE WATERS (§ 44*)—RIGHTS OF OWNERS OF SHORE LANDS—LAND FORMED IN SEA.**

At the time the earliest maps were made of the locality, in 1797, and subsequently, the inlet to Jamaica Bay on the southern coast of Long Island extended nearly north and south between what is now Barren Island on the west, and Rockaway Point or Beach on the east. Since then it has changed to a southwesterly direction from the bay, washing away a portion of the island, while Rockaway Point has been extended westward for several miles to the southward of the island. *Held*, on the evidence, that the land forming such extension was formed by the shifting and growth of shoals and bars which were not within the original boundaries of the island, nor attached to it above high-water mark, and does not belong to the shore owners thereon; also, that it did not form originally wholly as an accretion to Rockaway Beach, but rather by accretions to such bars as well as to the beach and the gradual filling of the shoals, the whole becoming subsequently attached to, and an extension of, the beach, and that the title to such parts as first formed separately vested in the state.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 267; Dec. Dig. § 44.*]

**3. QUIETING TITLE (§ 12*)—RIGHT OF ACTION—POSSESSION OF LAND.**

A suit to quiet title by one claimant of land against adverse claimants which has been fully tried will not be dismissed on the ground that complainant's remedy was by action of ejectment, where the evidence shows that complainant has the legal title, and both parties have been for some years claiming and exercising some sort of possession, tenants originally leasing from defendants having later leased from complainant and been allowed to remain by both parties.

[Ed. Note.—For other cases, see Quieting Title, Cent. Dig. §§ 8–12; Dec. Dig. § 12.*

Necessity of possession in suits to quiet title, see note to Jackson v. Simmons, 39 C. C. A. 522.]

**4. ADVERSE POSSESSION (§ 40*)—WHAT LAW GOVERNS—LAND ACQUIRED FROM STATE.**

Code Civ. Proc. N. Y. § 362, providing that adverse possession will not give title against the state unless continued for 40 years, does not operate in favor of a grantee of the state whose rights are governed by the general statute.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 172; Dec. Dig. § 40.*]

**5. ADVERSE POSSESSION (§ 96*)—NATURE AND REQUISITES—EXTENT OF POSSESSION.**

The building and occupancy of a shanty or a fishing cabin on the beach on a large tract of sand extending for some miles between a bay and the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sea, formed by accretion, or the setting of stakes or planting of small gardens without any inclosures, does not constitute an adverse possession of any more of the tract than is actually occupied under Code Civ. Proc. N. Y. §§ 370–372, providing that occupancy such as to constitute adverse possession shall be where the land has been substantially inclosed or is usually cultivated or improved.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 533; Dec. Dig. § 96.*]

**6.** ADVERSE POSSESSION (§ 25*)—NATURE AND REQUISITES—HOSTILE CHARACTER OF POSSESSION.

Where tenants leasing from defendants took new leases from complainant, an adverse claimant, before their occupancy had been long enough to give defendants title by adverse possession, their further occupancy cannot be counted as possession by defendants.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 116–120; Dec. § 25.*]

**7.** ADVERSE POSSESSION (§ 53*)—NATURE AND REQUISITES—CONTINUITY OF POSSESSION.

An occupant of land who after being ejected, although the judgment in ejectment was afterward reversed for want of jurisdiction in the court, abandoned the land, and did not return, cannot set up title by adverse possession in a suit commenced several years later.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 268; Dec. Dig. § 53.*]

**8.** QUIETING TITLE (§ 10*)—RIGHT OF ACTION—TITLE OF PLAINTIFF.

Where the complainant in a suit to quiet title holds the legal title his right to maintain the suit cannot be attacked by defendants, who are without title, on the ground that he holds his title as trustee, or that the conveyance to him was champertous.

[Ed. Note.—For other cases, see Quieting Title, Cent. Dig. § 37; Dec. Dig. § 10.*]

In Equity.

Everett J. Esselstyn (Frederic R. Kellogg, of counsel), for complainant.

Hubbard & Rushmore (George C. Case, of counsel), for defendants John R. Lott and Sarah Lott.

Henry M. Gescheidt, for defendants Byron Whitcomb and others.

CHATFIELD, District Judge. The present action involves a determination of the title to certain plots of land running across the strip of sand on the southern portion of Long Island, generally called "Rockaway Point." These plots of land are bounded laterally by the extension of the side lines of certain parcels upon the north side of what is known as Rockaway Inlet. The land to the north of this inlet is a large island, called for 200 years "Barn Island," and since that time "Barren Island," in the southeastern portion of the old town of Flatlands, in the county of Kings, and state of New York. The county line between Kings county and Queens county was first located by the state along the middle line of the channel between Barren Island and Rockaway Beach or Point as it existed in 1802–04. It is undisputed that this channel, which is the only outlet of Jamaica Bay to the ocean, has not remained in the position in which it was at the time the county lines were created by the state, and that the mid-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes*

dle line of the inlet at the present time, instead of leading straight out to the ocean, substantially in a north and south direction, runs approximately west-southwest some three miles, before it turns to the south, and passes the point of sandy beach or dunes which stretches to the east, and joins what was Rockaway Point when the county lines were laid out. Various state maps, as well as officers of the state and of the respective counties, have assumed that the county line has shifted and followed the movements of this channel; and the parties to this action now seem to take as settled the present location of the county boundary, treating all of this sand breach east of the present inlet as in the county of Queens, in which, for the purposes of assessment and for the recording of deeds, the state authorities locate the land under discussion. This fortunately makes it unnecessary to bring in the state of New York or any state officer as a party to this action, and the questions of adverse possession, of taxation, and the recording of titles in general are matters of such recent date with regard to the plots in question that the county lines determine nothing with respect to the present ownership of the land which might have been retained in the county of Kings, if the county boundary had been a line fixed by monuments, instead of by the middle of a navigable channel. Indeed, under the defendants' theory of the case, the properties claimed by them would seem to have been bodily shifted from one county to the other, not by the movement of the land itself, but by the displacement and shifting of the county boundary from time to time.

It is unnecessary to follow out the chains of title other than to say that the complainant is grantee under a full covenant and warranty deed made by the devisees of Collis P. Huntington on the 11th day of February, 1901, recorded in the county of Queens on the 27th day of September, 1902, in Liber 1287 of Deeds, p. 14, and that the complainant's title is traced through a deed from the city of New York, various partition and foreclosure suits, grants from the state of New York, and conveyances from private individuals to one of the patents granted by authority of the King of England by Governor Dongan of the Colony of New York in the year 1685, and back of that even by a title from the Indians. It appears in the course of the complainant's chain that in the year 1812 the United States was given, under the authority of the state of New York, the right to locate a fort upon what came to be known as Block House Point, and that during the War of 1812 certain militia erected a blockhouse, which has long since disappeared. The United States never took possession of the land in question, nor attempted to exert any dominion over it, except to grant one lease in 1872 (page 1418 of record), and, so far as the testimony presented in this case shows, obtained no title to any of the tract until about the year 1854, when a life saving station or boathouse previously on Barren Island was moved across the inlet and located upon the beach of Rockaway Point, within some 100 yards of the high-water mark, at the southeast corner of the point as it then existed. An examination of the charts, which will be referred to later, and an inspection of the land, show that dunes, with bushes and shrubs, reaching a height of 20 to 30 feet, cover the precise part of the beach upon which

the blockhouse stood, and the tract running therefrom to the southeast, including the original site of the life saving station. A considerable depression through the greater part of the beach as it exists at present, and having a generally southeast and northwest course, marks the strand at the period indicated when the life saving station was located near the point, and according to the testimony, as well as from indications at the present time, fixes the first locality as to which the peculiar questions of this case arise. In general, the title of the complainant, so far as it covers land existent through the entire period, is limited at the western end by these dunes, upon which it has been said the blockhouse and life saving station were placed. From the point of the old shore southwest of the life saving station to the present extreme western point of the beach, a distance of some three or four miles, the beach from ocean to inlet is claimed under the doctrine of accretion, as having been added to the land, both upland and beach immediately adjoining upon the east, and being in all other directions surrounded by water.

The defendants' title, likewise starting with grants from the Indians, had to do with properties stated to be on Barren Island, or Barn Island, and specifically located in said town of Flatlands. The chain of title comes down through various deeds and wills to the present owners or claimants, and their title to the upland, or to the portions of Barren Island claimed by them, is satisfactorily established, and their possession of all portions of the tracts claimed by them north of the present location of the inlet would seem to be beyond dispute. But the extension of the defendants' lines across the inlet (these side lines running some 8½ degrees east of south, according to the maps filed, from the survey made July, 1900, by Samuel K. McElroy, civil engineer, and put in evidence as Defendants' Exhibits 1 and 2) cross as well the present stretch of Rockaway Beach, or the lands added thereto by the westward movement of the inlet. The portions of the beach thus included within these lines so extended are a part of the particular portion of the so-called lands of Rockaway Beach, set apart and assigned to the grantors or predecessors of the complainant in a partition suit involving substantially all of the added or connected beach land, as well as some of the upland east of the old line near the life saving station.

The case involves the decision of a difficult question of fact, in that it must be determined whether the movement of the inlet was such that all of the land added to Rockaway Point or connected with it from time to time toward the west has been raised up out of the ocean and established above high-water mark by what is known as the gradual process of accretion; or whether by a sudden and plainly discernible shifting of the inlet, or by a number of such shiftings, the entire channel, including and carrying with it the county boundary, has broken through what previously was a part of the county of Kings. If the latter method be proved, the old bed of the inlet has filled up by accretion, both to the southwest, from the upland or beach of the complainant, and to the east or northeast from the bars or land to the south of what is now Barren Island.

172 F.—37

The defendants' claim is dependent upon their being able to prove, not only that there have been sudden and violent shiftings of position by the inlet, so called, but also that certain bars and land included within the grants in their chain of title to Barren Island have occupied, with more or less accretion in all directions, some parts of the beach now joined to the old Rockaway Point, and that throughout the successive changes in the position of the inlet there has always existed some portion of these lands within the boundaries of their original grants, to which lands could attach by accretion in the same way, and by the same natural processes, through which the intervening spaces were filled and the properties in question joined to the upland near the life saving station and the blockhouse point.

A third possibility suggests itself, which must be considered in the light of the various attempts at possession on the part of the defendants and their grantors and tenants. This third possibility would of itself be sufficient to defeat the title of the complainant, and would leave him limited by lines of the original grants, and by what could properly be held as accretion thereto, for the burden of proof is upon the complainant in the present action, and he must establish, not only that the defendants have not title, but that his title is proven affirmatively. This third position would result from a finding that the lands in question were formed outside of high-water mark, and therefore the property of the state of New York (Mulry v. Norton, 100 N. Y. 424, 3 N. E. 581, 53 Am. Rep. 206; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331), but were never a part of, or joined to, land above high-water mark included within any of the grants in the defendants' chain of title; that is, that the accretion, if any, has been the property of the state, rather than that of individuals. The question of possession or of adverse holding beween the state and the lessees or tenants of the defendants could not, of course, be determined in this action, except as we may consider the effect of the deed from the state to the complainant's grantors hereinafter set forth.

The evidence on the question of fact has been of two kinds, charts or maps, including government surveys, and testimony of witnesses familiar with the localities in question. The earliest map shown seems to have been made by one Jeremiah Lott from surveys prior to the 20th day of November, 1797, when the map is said to have been protracted. This map was filed in the office of the state engineeer and surveyor, and a copy has been certified in evidence. Objection was made to the entry of this map in evidence, but there seems to be no good reason for doubting its authenticity, and it is apparent from the map itself that the portions relating to Barren Island and Rockaway were not plotted from surveys, but Barren Island is said to be taken from computation, and shows merely an approximate or relative plan of that locality. The next map offered in evidence was published under an act of the Legislature of the state of New York in the year 1827, and purports to show a compilation of surveys of the counties of New York, Kings, Queens, and Richmond. Objection was made to the acceptance of this map in evidence. But there seems to be no reason for not taking it for what it is worth; and, while some of the localities

seem to show more or less distortion, it throws some light upon the
general formation of the coast upon the southern side of Long Island
at the period within which the map was made. The earliest chart put
in evidence by the complainant (Exhibit 61) was published by the Unit-
ed States government as the result of surveys from the 26th day of
September to the 3d day of October, 1835, and gives the outlines, to-
gether with the character of the soil and vegetation over the locality
of Jamaica Bay, but does not purport to give any soundings or depths
of water. It will be noticed that between the map of 1827 and the sur-
vey of 1835 the first substantial change in what will be referred to as
"Rockaway Point" seems to have occurred. The map of 1797 gives no
latitude, while the map of 1827 places the southernmost point of
Barren Island somewhat further south than either Rockaway Beach or
Coney Island, and gives the latitude of this southernmost point as
40° 33' north latitude. The United States government chart of 1835
shows the southernmost point of Barren Island and the southernmost
point of Rockaway Beach substantially on an even parallel, at about
40° 34' 15" north latitude. But allowing for the inaccuracies in lati-
tude, and in general relative positions of the locations shown by the
map of 1827, a substantial change in the form of both Barren Island
and Rockaway Beach is noticeable, in that the southeasterly corner of
Barren Island has somewhat disappeared, making that corner oblique
rather than right angled; and the western end of Rockaway Beach
has changed from either the "sore thumb" or bifurcated formation
of 1827 to that of a point having its westernmost extremity upon the
south or ocean side, and with the portion characteristically denomi-
nated the "thumb" already cut off by the ebb tide, coming out of
Jamaica Bay.

The United States in 1841 issued a chart showing the soundings of
Rockaway Inlet and a part of Jamaica Bay, and on this chart, while
the southeast corner and southern portion of Barren Island shows the
same formations as on the chart of 1835, the western point of Rocka-
way Beach has still further protruded, and has begun to force the
general direction of the inlet from a north and south to a northeast
and southwest course. The deep water channel shown in the chart
of 1841 lies close to Barren Island upon its southeast corner, and then
turns and runs out, in a southerly direction, to the open ocean. This
channel in 1841 passed west of a bar called Duck Bar, and referred to
by almost every witness who has testified in this case. Another large
sand bar was charted immediately to the westward of this channel
(approximately of even latitude with Duck Bar), while a broad space
of water, containing a minimum depth at low tide of some nine feet,
stretched between Duck Bar and the southwest Point of Rockaway
Beach. This is plainly what has been referred to by most of the wit-
nesses as the "East Way" or "East Channel," and means no more than
a strip of ordinarily deep water around the point of Rockaway Beach.
Thus, Duck Bar at this period lay between this stretch called the "East
Way" and the deeper channel scoured out by the tide, setting down
from alongside of Barren Island. This chart also shows between Bar-

ren Island and West Bar a shallow stretch of water in some places not more than two feet deep at low tide, and this, at various times, was known as the "West Way," which long subsequently became deep enough for navigation. To a certain extent this West Way indicates the location of the ultimate deep water channel in and out of Jamaica Bay. This West Bar seems to have at some time been called Pelican Bar from a beach known for many years as Pelican Beach, and really constituting the western half of the southern shore of Barren Island. Pelican Beach terminated at what is known as Plumb Gut. Upon the western side of Plumb Gut the beach evidently formed a part of what is known as Coney Island. It will be noticed from an examination of the charts that between 1841 and 1866 Barren Island was separated from Pelican Beach by what came to be called "Dead Horse Inlet," and again at the time of the extreme changes in the neighborhood of the year 1878 a great part of the land formerly called Pelican Beach was washed away, leaving Plumb Island exposed upon the water front, while Barren Island was very materially reduced in size, the southwest corner or portion being so removed, that what is now known as Dead Horse Bay was caused to substantially open out into the ocean, instead of having to be approached through the considerable channel that previously had been called Dead Horse Inlet. These changes, however, were much less in extent than the changes and additions to Rockaway Point during the same period. If the map of 1827 corresponded in its general locations and in its degrees of latitude to the Government charts of 1835 and 1841, we should have less difficulty in fixing the extreme southern boundary of Barren Island, and, if the government charts of 1835 and 1841 placed the southern boundary of Barren Island in the latitude shown by the map of 1827, then the testimony of the defendants' witnesses, Mr. Gescheidt and others, to the effect that the portions of Barren Island, submerged within their recollection, had extended to points within the present boundaries of the beach at Rockaway Point, would be clearly substantiated. But the situation, so far as latitude is concerned, with which the defendants' witnesses start their recollection of the locality, is substantially that shown by the government charts of 1835 and 1841, and under the circumstances such charts, unless shown to be at fault, are better evidence than human recollection about such small questions as the depths of water at precise points and the relative locations upon a north and south line of the shoals of a channel where navigable water was the test of how the channel should be used, and would necessarily be the central feature of the witnesses' recollection. Human memory as to definite monuments is excellent testimony of the existence and general location of these monuments, but a reliable chart or map must be depended on as to small distances and details, even as against human recollection, when that recollection or memory has not been fixed by something connected with those same details.

The witnesses called by the complainant and by the defendants agree in fixing the next great change in these localities after the condition shown by the chart of 1835 at the occasion of a storm which occurred probably in the year 1855.

Two of the witnesses, Dodge and Hicks, started in the year 1855 from near Hook Creek, which is well up in Jamaica Bay, to go out to sea through the inlet with a load of coal for a town further to the eastward on the Long Island coast. They were detained by a severe storm, and could not return for a couple of days. Both witnesses agree that upon their return they worked in from the ocean through substantially the same water in which they passed out until they came to the inlet proper between Barren Island and Rockaway Beach, and there they sailed right through, as Dodge puts it, "where Chaney's garden had been." It appears that ridges (upon which trees were growing) and a considerable tract of garden and upland were washed away from the southeast corner of Barren Island, and a strip some 500 or 600 feet wide cut off by the sea. The bars and shoals to the southeast of the inlet and along the entire southern front of the island in the neighborhood of the so-called Duck Bar shifted their posi·· tion, and the so-called East Way or passage around the point of Rock·· away Beach was filled up, either at the time of the storm or gradually within a short time thereafter, while the western extremity of the point began its rapid progress, assuming the position which continued until 1877 and 1878. The southwestern portion of Barren Island was likewise materially affected by this storm. The so-called West Way, or shallow strip of water passing between the West or Pelican Bars, and the so-called Pelican Beach upon Barren Island, as well changed its shape and position, but did not become more than a shallow body of water navigable by very small boats at high tide, and at low tide substantially dry in various places between Barren Island and the larger bars to the south. But on the Rockaway side the "East Way" substantially united with what had been called the "South Way," or the direct north and south channel between the so-called Duck and West Bars, and the process of accretion either took place on the bars and from Rockaway Point so as to close up the inlet, or else there occurred what is called avulsion; that is, a bodily movement of the inlet from one position to the other, with the corresponding resultant accretion within the limits of the old inlet.

The severe storms of the period around 1878 have already been referred to. To the west of Barren Island Pelican Bar and Beach were destroyed to a large extent, the shallow West Way was deepened and enlarged, Pelican Beach or Island, together with much of the land in front of Plumb Island, disappeared, and Plumb Island became bounded on the south practically by the ocean. The so-called Duck Bar shifted so as to become indistinguishable from the West Bar, and Rockaway Point was extended to the old position of Duck Bar, leaving but one channel which immediately south of Barren Island ran practically northeast as an entrance to Jamaica Bay. Since 1878 and 1879 the growth of Rockaway Beach to the westward seems to have been gradual. The present western extremity of the beach is almost due south of Plumb Island, and reaching nearly to the longitude of the eastern extremity of Coney Island as it now exists. The character of the beach itself and the various United States charts show that during this later period the growth has been what can properly be

called accretion; and we must therefore consider the boundaries of the land and bars, the position of high-water mark upon the Atlantic Ocean, and the positions of the inlet during the periods from 1845 to 1879, in order to ascertain what is the southern boundary of the lands upon Barren Island, and whether the beach now attached to Rockaway Point has emerged from the sea within the boundaries of the territory belonging to the defendants, or whether it has been formed by accretion either to Rockaway Point or to lands which thereby became the property of the state. As has been said, the condition in 1845 must be taken as a starting point, for the testimony of the witnesses is to the effect that Barren Island at that time extended for at least half a mile south of the nearest portion of Rockaway Beach, and all of the bars and points testified to by the witnesses for the defendants must be treated from the position given them by those witnesses, as there is no authentic prior record which would give any better boundaries for the purpose of the defendants' case.

The case of Mulry v. Norton, supra, was a contest of title over certain lands submerged by the sea within the boundaries of the plaintiff's grant, and a subsequent emerging of the beach and westward growth along the sunken front until the submerged portions had been restored, but with a shallow lagoon between the new portion and the former high-water mark. The court held that the rebuilding or reformation of the land within the boundaries of the former territory when under such circumstances as not to constitute accretion to some other strip would vest the original owners with title as against the state; that accretion could not take place without contiguity, but even when contiguity existed could not cross the lateral boundary lines; and that the owner of the upland would regain the beach, although there had been a previous encroachment of the high-water line to a point inside of where the new formation occurred. In Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331, the Supreme Court of the United States recites many decisions relating to riparian rights, and questions of accretion or title to lands in navigable waters. It cites the case of Mulry v. Norton, supra (declaring the law of New York to be as above stated), and also cases along the Mississippi river, such as Jones v. Soulard, 24 How. 41, 16 L. Ed. 604, Railroad Co. v. Schurmeir, 7 Wall. 272, 19 L. Ed. 74, Yates v. Milwaukee, 10 Wall. 497, 19 L. Ed. 984, and many other decisions showing the holdings of the United States Supreme Court and of state courts with respect to the rights of riparian owners in protecting their access to a navigable stream, and to the acquisition of land forming within the navigable water in front of their property. The court says (page 35 of 152 U. S., page 561 of 14 Sup. Ct. [38 L. Ed. 331]):

"The rule, everywhere admitted, that, where the land encroaches upon the water by gradual and imperceptible degrees, the accretion or alluvion belongs to the owner of the land, is equally applicable to lands bounding on tide waters or on fresh waters, and to the king or the state as to private persons; and is independent of the law governing the title in the soil covered by the water"— citing cases from both England and the United States.

No distinction is drawn between lands arising out of navigable water in streams or rivers where the riparian rights extend into the

stream, or where the bed of the river is owned to the middle one by the riparian proprietors, and land arising out of the sea, or arms of the sea, below high-water mark, when the addition is in front of and contiguous to the riparian or littoral property. Blackstone in his Commentaries (page 262) says that lands emerging out of the sea within the bounds of any person belonged to him as between him and the crown; and it is from this situation that the doctrine of Mulry v. Norton is worked out. Hence property reformed by the sea, after having once been taken away, is to be considered as restored, rather than as a growth or addition to different property, to which the actual accretion may have attached.

But with respect to Barren Island an entirely different situation arises. It is impossible on the record to hold that the upland or beach of Barren Island above high-water mark has ever occupied the position of the land in question. The charts, however, of 1835 and 1875, hereinbefore referred to, show Duck Bar as an island—that is, having some portions above high-water mark at all times—and in 1875 this Duck Bar Island with deep water on each side, extended approximately north and south over a mile in length, and almost in contact with Barren Island at its nearest point. Between this Duck Bar Island and Barren Island was shoal water, but by the next great movement of Rockaway Inlet Rockaway Beach extended to and included a part of this Duck Bar, which has ever since remained dry land, and the shoal water became the inlet. This movement, as has been said, occurred in the 70's, and, the greater part of the land actually in question in this suit having been formed by that movement of the inlet, we must consider whether the owners of the upland on Barren Island acquired from the formation of this Duck Bar prior to 1875 any title therein; and if they did, inasmuch as Duck Bar was so narrow in its east and west dimensions, the next question, which is even more difficult, is as follows: Would the owners of the upland of Barren Island obtain title to the entire east and west strip formed by this movement of the inlet, that is, by the growth of a long extension of Rockaway Beach out of deep water, because some one of those Barren Island owners might have claimed the narrow strip of Duck Bar immediately in front of his property? This question is yet more complicated, in that when the inlet made this final shift, and the beach which we have been considering was joined to Duck Bar, a deep-water channel was washed between Barren Island and all of the lands in question, which channel has continued and deepened to the present time. But, with respect to Barren Island, the state or county authorities seem to have assumed that the boundary line between Kings and Queens counties has followed the main thread of the inlet in its various positions. There has always been a southern boundary of Barren Island bounded by high-water mark, whether that high-water mark be composed of the so-called West Way and the Inlet or the so-called West Way and South Way united together and continuing into the Inlet. The West Way, according to the testimony of Jurien S. Lott and several others, whose statements are clear enough to be almost beyond question. has not been navigable for boats of any size until within the memory of

the last generation. But prior to that the high-water mark seems to have always existed. The land occupied by Chaney's garden or by the shore of Barren Island at any time, even back to the chart of 1835, was of a latitude north of the present limits of Rockaway Beach or the extensions at any time. The nearest point of Rockaway Beach to Barren Island, until the western direction of the beach had progressed to a great extent, was on the inner or bay side represented originally by the so-called "sore thumb"; and it is evident from all of the charts that Barren Island at every period under discussion extended much to the south of a straight line across the inlet at that point, but as this point was eroded by the ebb tide, and the southern or outside beach of Rockaway Point moved toward the west, the inlet has widened at its northern outlet into Jamaica Bay, and, in addition, the charts show a considerable destruction of Barren Island itself upon its northeast corner. The effect of all this has been to shift the narrowest part of the inlet from its northern extremity to one much further south, but does not alter the proposition that Barren Island itself has never in the form of land above high-water mark extended to positions within the confines of the beach upon the southern side of the inlet, wherever that inlet may be. Shifting sandbars, upon which the Black Warrior went ashore in the year 1859, at that time extended out in front of Barren Island, while the deep-water channel up the inlet ran to the east of these bars. The testimony of the witnesses places this wreck as far as 2½ miles south of Barren Island, and yet other of the witnesses testify that at low water they have walked over the shoals and through the shallows around the Black Warrior. This wreck is said to still exist, and to be upon the southern line of the shoal water at the south of Rockaway Beach, some half or three-quarters of a mile out in the ocean from low-water mark. The government buoy maintained because of this wreck and shoal is directly south of Barren Island, and is nearly a mile outside of the present line of Rockaway Beach. If the southern latitude of Barren Island and of Rockaway Beach were to be taken as shown upon the state map, made by Burr, and published in 1827, the present location of the Black Warrior would be within the former boundaries of Barren Island above high-water mark. But the testimony of the defendants contradicts this possibility, and the location by them of the wreck corroborates the contention of the complainant, that Rockaway Point has been made up from the shifting and growth of shoals, and bars attaching themselves to Rockaway Beach, but entirely outside of the furthest boundaries of Barren Island, and that these bars and shoals have never formed a part of Barren Island, so as to be connected with its main land by anything above high-water mark.

Comment has been previously made in this opinion upon the peculiar coincidence with which apparently honest recollection on the part of witnesses as to later conditions agrees with physical facts shown by some of the earlier charts. But equally persuasive testimony and equally definite charts of different dates between the two negative completely the force of any conclusion which might be drawn from the later testimony. As an instance of this, the testimony of Mr. Ge-

scheidt and some of the other witnesses as to the distance to which Barren Island extended to the south, and the facility with which a person could walk over dry sandbars out to the neighborhood of the Black Warrior wreck, and in the same way the Lott map of 1797, and the Burr map of 1828, fit in much more nearly with the charts since 1868, as explained by the testimony of the defendants' witnesses, than with the condition shown under the charts of 1834, 1844, and so on. Perhaps the most striking example of this sort is a chart said to have been produced by the complainant's witness Dodge, although he failed to identify it upon the trial, which was issued by the United States government under the date of 1875, and thus shows conditions subsequent to the great storm of 1855, but prior to the extensive changes of the 70's. According to this map, the deep-water way curved around close to the eastern shore of Barren Island, and close to the eastern edge of what was then called Duck Bar; the earlier deep-water channel to the westward of Duck Bar having entirely disappeared. The depth of water in most places of about one or two feet at low tide, and in no place more than four feet, between Barren Island and the Black Warrior wreck, in a line following the crest of the sandbar, makes it entirely plain that Mr. Gescheidt's recollection of walking out to the Black Warrior wreck under extremely low tides may have been correct, and likely to happen to any one familiar with those waters. But the chart immediately preceding this one, and showing conditions prior to the effects of the storm of 1855, carry the deep-water way between Duck Bar and Barren Island, and do not leave it possible to conclude that the bars upon which Mr. Gescheidt may have proceeded to the scene of the wreck were at any time a part of Barren Island, or connected with it by dry land at high water. On page 1668 of the record, the Indian deed to the predecessors in title of the defendants uses the following language:

"And also all the privileges and appurtenances both of the upland or marshes always belonging thereunto, as the Strann Beach of Beaches as namely that, running out more Westerly with the upland adjoining and is at some times by the Ocean Sea wholly enclosed, called Hoopannah and Shaustomororto & Macutteris."

To this attention is called by the defendants as proving there were three bars in front of Barren Island conveyed by this deed. But it is just as likely, and even more persuasive, that they were a part of the broken lands to the west in the neighborhood of Garrison's Creek and Pelican Beach, and the only conclusion which can be drawn from this deed and the following deed is that the defendants' southern boundary was the Atlantic Ocean. The defendants' strongest argument for this phase of the case is that their boundary was the ocean, and that they are entitled to littoral rights upon the ocean, as against the state of New York, or any one else. In Mulry v. Norton, supra, not only did the court determine that the lands formed in front of the complainant's property had been restored within the original boundaries, but applied to such a situation the well-recognized doctrine of riparian rights and accretion or reliction as above stated. Hence, recognizing the doctrine that accretion cannot add to land in a lateral direction over the boundaries of an adjoining owner, the court held

that the plaintiff had title to the lands in front of his beach formed by accretion to the adjoining property, but within his original lines.

Based upon this proposition, and upon the conclusion in the case of Mulry v. Norton, the defendants claim that they were given property bounded on the south by the Atlantic Ocean, that any land formed in front of their property as between them and the state of New York belongs to them, and that the complainant, representing lateral owners, cannot claim, even under the doctrine of accretion, a strip of land extending in the form of a point across the front of the defendants' properties, and thus making their southerly boundary the inlet instead of the ocean. It does not seem that this doctrine can be carried thus far. The defendants' land was bounded by the ocean; that is, by tide water. Unless property be washed away and restored within the original limits, the precise doctrine of Mulry v. Norton would not apply, and such facts have not been shown in the present case. It is impossible to hold that in the sea, with a wide stretch of navigable water between the two properties, a strip or point of land entirely outside of any boundary lines previously limiting the property in question should be considered as a part of that land. The thread of the stream does not apply to the ocean. The question of navigable water and of access is also inapplicable, for both of these exist under all circumstances, and, so long as navigable water exists between, it would not seem that the doctrine of the "river" cases such as recited in Shively v. Bowlby, supra, could apply.

It would seem, therefore, that the claims of the defendants to any of the territory of Rockaway Beach cannot be established upon the theory that these lands constitute a part of their original holdings or the holdings of their predecessors in title. But the complainant does not satisfactorily show that the land west of the inlet as it existed in 1845 and 1850 near the life saving station has been added to their property entirely by the process of accretion. There seems to be considerable basis for holding that the accretion has been upon the bars as well as upon the point of the beach, and that from time to time the sandy shoals projecting above low-water mark, and apparently belonging to the state of New York, have themselves been enlarged by accretion, and then have been bodily annexed and attached to Rockaway Beach, and new bars have been formed further to the westward; the same process being then repeated until the present stage in which for the last 30 years, more or less, true accretion has resulted, and the progression of the beach has been more gradual and steady in its motion toward the west.

Assuming, therefore, that the complainant has not satisfactorily proven that the entire beach belongs to him or his predecessors in title by the doctrine of accretion, it is necessary to consider the effect of the deed from the state of New York in accordance with an act of the Legislature in the year 1887, and also to consider the defenses of adverse possession, and the allegations of the defendant that the present action cannot be maintained, inasmuch as the complainant would be left to an action of ejectment, if he is unable to show such possession of the territory as would be sufficient for an action to quiet title, or

to settle conflicting claims to land of which he has record title and statutory possession. It is apparent that the defendants' contention that they are entitled to a jury trial is but secondary to a determination of the issue as to whether the present action is in reality one of ejectment, and whether the defendants have had possession of the property in question. The complainant must show possession for one year before he can maintain an action of this nature. Section 1638, N. Y. Code Civ. Proc. The lands involved are entirely beach lands, composed of white sand, with some swampy deposits, and the only vegetation consists of grass and clumps of small bushes. Any attempt at cultivation, aside from the cutting of hay upon the grassy stretches in the hollows or flat portions of the beach, have been confined to small garden plots near some of the cottages or boathouses of a few individuals, who will be referred to later. In general, there was no occupation of any portion of this beach until some time around the year 1889, when one Smith Foster (who had been there fishing since 1876) established a hunter's and fisherman's cabin, and spent his summers upon the land. He subsequently built several cabins, and gradually enlarged the house in which he lived the entire year, and in which he raised a family. This house was destroyed by fire by agents of the complainant in 1903 after an order in dispossess proceedings, later reversed on appeal, in which it was held that the Municipal Court had no jurisdiction, inasmuch as title to the land was involved. Some seven other tenants of the defendants who had from time to time between the years 1897 and 1902 leased cottage sites at points along the beach subsequently yielded to the demands upon them by a representative of the complainant, made terms, and took out leases from his agent. Their actions therefore are of no value in determining who is now in actual possession of the land. For some 30 years each tenant or occupant protected himself by making arrangements with the defendants, and since that time the tenants or occupants have acquiesced in the demands of the complainant as well, and have not been disturbed by either party. The defendants have from time to time surveyed or run lines, set out posts, and put up certain trespass signs, substantially all of which were soon thereafter taken down by agents of the complainant; and it would seem that since the question has arisen from the dispossess proceedings in 1903 both parties, so far as able without an actual clash, have exercised certain dominion or possession over such parts of the beach as they considered would establish their claims, and would serve the purpose of giving evidence of use of the lands in question. These lands, while not wild lands in the sense of being forest or prairie, are almost entirely wild in so far as any permanent change has been made by human beings in their appearance or condition, except in the immediate vicinity of the six or seven cottages above referred to, and no fencing, or anything of that nature, has been attempted. The complainant, of course, claiming all of the beach, could not fence it in other than by high-water mark on each side, while the defendants, marking out their lines by posts, attempted to keep tenants upon the land, and to set out signs showing their title, have apparently succeeded in maintaining a more or less joint and conflicting sort of possession,

but neither party has had exclusive possession since 1902 of such a nature as to import acquiescence on the part of the other. Under such circumstances it would seem to be impossible to hold that this action, completely tried, where the parties have had all their claims and issues thoroughly presented, should be dismissed upon the technical ground that the defendants were so clearly in possession of the land that nothing but an action of ejectment would lie. We must, therefore, pass to the question of adverse possession, or possession against all claimants and the public, bearing in mind the possibility that parts of the land were at some of these periods property which could have been claimed by the state.

In considering either the question of title or of possession to the lands west of the life saving station, it must be noted that from 1809 to 1887 the entire point upon which the life saving station was located belonged to Ryder and to his grantee the state of New York. If the complainant's theory of gradual accretion were fully substantiated, that accretion, so far as recorded titles are concerned, was to lands belonging to the state, in whom was also vested the title between high and low water mark. The southern boundary of the state was at low-water mark of the most southern tide marks of the islands, bars, and beaches in question. The case of Attrill v. Degrauw (C. C.) 90 Fed. 556, determined, among other things, that the title of the state of New York to the point of Rockaway Beach was valid, and was conveyed to the predecessors in title of the complainant by the transfer under the authority of the act of the Legislature, the validity of which transfer was one of the grounds of the decision of the Circuit Court in that action. It must also be remembered that at the time Smith Foster first occupied in any way any of the land in question the point had already reached a position well to the west of the life saving station site, and substantially south of Barren Island, according to the charts, actually including some of the strips now claimed by the defendants. In 1877 and 1878, when the next great addition to the point or jump of the channel is said to have occurred, the land added extended across the south front of Barren Island, being immediately west of that upon which Smith Foster had been staying, more or less, for some three or four years. It would seem, therefore, that Smith Foster and the other occupants of any portions of these lands were either there as tenants or agents of the defendants or as trespassers upon the property of the state of New York. Smith Foster's occupancy (such as it was) and the use of certain land for the purpose of cutting grass and fishing and hunting by some of the defendants, as well as by others of the public, had continued at the time of the deed from the state of New York for some 11 years; and, inasmuch as title against the state cannot be secured, under the provisions of section 362 of the Code of Civil Procedure of New York, in the method known as that of adverse possession, until the 40-year period of limitation had expired, no rights had apparently been acquired against the state, nor even up to the present time would the interval have been sufficient to have allowed such rights to be perfected. But the deed of the state to private individuals was given in 1887, and it must be held that a successor to the title of the state can se-

cure no advantage from the fact that the statute of limitations is greater against the state than against himself, but he is bound by the ordinary statute against himself and his grantors, and adverse possession for 20 years would in such case be sufficient. Section 363 of the New York Code fixes the rights of grantors of the state, but does not affect the rights of other parties against them. As has been said, no actual possession in the sense of cultivation or fencing, or continuous evidence of control and ownership, has been exerted by the defendants or even the complainant as to the whole of the tract, or the whole of the strips to which the defendants claim title. No monuments have been erected, and monuments alone in such land might prove insufficient. The mere planting of stakes would not indicate the purpose for which they were planted, and certainly the planting of stakes by servants of the defendants would not be equivalent to any occupation by Smith Foster or any of the other tenants, nor has their occupation been extensive enough to give notice of what they were occupying. The vast stretch of sand with no human signs or traces of occupation beyond the planting of a stake, or the existence of a wheel track or road, could hardly be said to be "occupied" because a shanty or fishing cabin was erected upon a convenient point overlooking the water. A glance at the premises of Smith Foster and these other tenants indicates that they are no more occupants of the entire strip than are the campers who put up a tent in a similar position along the seashore, and who are merely squatters upon the beach, for the purpose of camping.

Under section 370 of the Code of Civil Procedure, a person claiming title founded upon a written instrument is deemed to have been possessed and occupied of land sufficiently to constitute adverse possession (1) where it has been usually cultivated or improved; (2) where it has been protected by a substantial inclosure; (3) where, although not inclosed, it has been used for the supply of fuel or of fencing timber, either for the purposes of husbandry, or for the ordinary use of the occupant, if this use has continued for the statutory period. By section 371 it is provided that no adverse possession not founded upon a written instrument or a judgment or decree shall apply to more than the premises actually occupied. And by section 372 such occupation is said to be (1) where it has been protected by a substantial inclosure, (2) where it has been usually cultivated or improved. The occupation of no part of Rockaway Beach meets these requirements, with the exception of the immaterial portions around the houses of the tenants in question. As to all of these, with the exception of Smith Foster, whatever possession they may have had adverse to the complainant has been relinquished by their intentional failure to pay rent to the defendants, and by their taking of new leases under which they have paid rent to the complainant, this having happened in each case before the 20-year period, which would complete their possession, had expired. Their acts and their possession of the land cannot be taken advantage of by the defendants after the making of the new leases and the paying of rent to the complainant, for, if the defendants claim adverse possession by reason of the acts of these tenants, such possession must be adverse—that is, under a claim of title hostile to that of the complain-

ant—and the tenants, so far as they are concerned, apparently ceased their share in maintaining a title hostile to the complainant when they took out the new leases and began to pay rent. From that time they apparently held adversely to the defendants or as tenants at will at the most, and in view of the knowledge of all the parties at that time, and of the failure of the defendants to either attempt to dispossess or eject these tenants who had ceased to pay rent, it does not seem that since the making of the new leases by the complainant to these tenants any act of theirs could perfect a title by adverse possession in the defendants. As to Smith Foster himself the situation is somewhat different. The amended complaint alleges that Smith Foster claims to have occupied and to be entitled to possession of a part of the property as the lessee and representative of, for, and on behalf of the remaining defendants, or some of them, and that the said defendant Foster is endeavoring to interfere with the complainant's possession of the property by the assertion of alleged rights in himself to said property or to a part thereof, and to certain buildings erected by him as such alleged representative, lessee, or otherwise; that he has endeavored to cast a cloud upon the title, and has trespassed upon the property of the complainant, and is being used by the remaining defendants to establish their claim to title or possession. The answer of the defendants, including Smith Foster, admits the allegations that Foster claims to have occupied and to be entitled to the possession of some of the property as the lessee and representative of the remaining defendants, but denies the allegation that he has attempted to trespass or to occupy any part of the premises after the assertion of alleged rights in himself, etc. Nowhere in this action has Smith Foster set up a claim that there is any title in himself by adverse possession, and it is unnecessary therefore to consider his acts, except as the remaining defendants seek to take advantage of what he has done as their representative. The testimony shows that Foster, more or less continuously from 1876 to 1903, occupied the parcel of land upon which he built the house and the buildings adjoining thereto, which were destroyed in the year 1903, and that he cultivated certain land immediately around these buildings. Subsequently he located a houseboat upon a different spot, and has remained in possession of the site of this houseboat, but the tract occupied thereby is merely a section of beach and extremely limited in extent. No title by adverse possession has been acquired by his acts since 1903. As to whatever rights might have been acquired by his occupation from 1876 to 1903, a different situation exists. There is a dispute in the testimony as to whether Foster admitted to Mr. Maxwell Evarts, attorney for the complainant's grantor, that he yielded possession, and merely wanted time to get off from the premises. But, whether or not he made such an admission, it would seem that after his forcible ejection in that year neither he nor any of the defendants nor any one on their behalf ever returned and took possession of the property from which he had been ejected, and since that date he has exerted no rights of possession, except to moor his houseboat in the place which it now occupies. Under these circumstances, it must be held that his possession of the property which he had previously occupied did not continue down to the time of the bringing of this

action, and hence could not constitute an adverse title under the Code against the complainant, who enforced his rights in the year 1903.

It is also claimed by the defendants that the complainant is not the real party in interest, and under section 449 of the Code of Civil Procedure cannot maintain the present action. It is unnecessary to consider the rights of beneficiaries, or whether the trust charged upon the property and admitted by the complainant is valid. The entire legal title is in him. So far as the record is concerned, he is the absolute owner of the property, and the purposes for which he held it would not defeat an action like the present. Nor can the claim that the deed of the Huntingtons to the complainant was void for champerty avail the defendants. No such possession in the defendants has been shown as would invalidate the complainant's deed (Crary v. Goodman, 22 N. Y. 170; Danziger v. Boyd, 120 N. Y. 628, 24 N. E. 482), and the determination of the questions of fact as to adverse possession makes it plain that the deed of the record title from the Huntingtons to Van Deventer in 1901 should be upheld. An extremely interesting and troublesome situation would arise if in the future the growth of Rockaway Beach should be such that the channel or inlet between the present limits of the beach and Coney Island should be closed in a similar way to that in which the beach (considered in the case of Mulry v. Norton) was rejoined to the lands upon the west, and if a series of storms or convulsions of land in that neighborhood should open an inlet to Jamaica Bay at some point in front of the bay itself. Such a change would bring up directly the determination of the question whether owners of land fronting upon the ocean were entitled to a straight outlet to the high seas, or to any land that might be formed or arise from the sea within the extension of their lateral boundaries to that point, and, if the doctrine of the Mississippi River Cases could be held to apply, such land would necessarily become the property of the owners of the upland in front of which the new territory was formed. The effect of the determination which the court has reached previously in this opinion makes it necessary to consider this question. But, as has been said, inasmuch as the ownership of land upon the sea terminates at high-water mark, and inasmuch as the right to reach navigable water does not require an outlet straight out to the high seas, it would seem to follow that the creation of such a channel in front of littoral property as is now represented by Rockaway Inlet would terminate any claim to lands formed entirely outside of the original boundary lines, and entirely outside of any coast line upon the north side of their inlet. It would be impossible to consider that property holders upon the shores of lower New York Bay could claim ownership of any part of Sandy Hook simply because it had been formed between them and the open ocean if their original deeds had been bounded by that ocean, nor could the owners of land in Rhode Island claim title to the extension of Long Island if the action of the sea should be such as to carry it to the eastward in such a way as to shut off the sea coast of Rhode Island, as it does that of Connecticut; and yet these questions would differ from the present only in degree, and not in kind, if the finding of the court as to the formation of the beach in question be correct.

Upon the whole case, therefore, it must be held that the complainant has shown title to the property involved, and should have a decree against all the defendants.